689 So.2d 259 (1997)
Alvin Leroy MORTON, Appellant,
v.
STATE of Florida, Appellee.
No. 83422.
Supreme Court of Florida.
March 6, 1997.
*260 James Marion Moorman, Public Defender and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Candace M. Sabella, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Alvin LeRoy Morton. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
In the late evening of January 26 or early morning of January 27, 1992, appellant Alvin LeRoy Morton, accompanied by Bobby Garner and Tim Kane, forcibly entered the home of John Bowers and his mother Madeline Weisser. Two other individuals, Chris Walker and Mike Rodkey, went with them to the *261 house but did not enter. Morton carried a shotgun and one of the others possessed a "Rambo" style knife. They began looking around the living room for something to take when Bowers and Weisser entered the room from another area of the house. Morton ordered the two of them to get down on the floor, and they complied. Bowers agreed to give them whatever they wanted and pleaded for his life but Morton replied that Bowers would call the cops. When Bowers insisted that he would not, Morton retorted, "That's what they all say," and shot Bowers in the back of the neck, killing him. Morton also attempted to shoot Weisser, but the gun jammed. He then tried to stab her, but when the knife would not penetrate, Garner stepped on the knife and pushed it in. Weisser ultimately was stabbed eight times in the back of the neck and her spinal cord was severed. Before leaving the scene, either Garner or Morton cut off one of Bowers' pinky fingers. They later showed it to their friend Jeff Madden.
Acting on a tip, police and firefighters went to the victims' residence, where the mattresses had been set on fire, and discovered the bodies. Morton was later found hiding in the attic of his home. The murder weapons were discovered underneath Garner's mother's trailer. Morton later confessed to shooting Bowers and helping make the first cut on Weisser.
Morton was convicted on both counts of first-degree premeditated murder. The jury recommended death on both counts by a vote of 11-1. The trial court found the following aggravators for each of the murders: (1) the murder had been committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (2) the murder was committed while the defendant was engaged in the commission of, or an attempt to commit, a robbery and/or burglary; and (3) the murder was committed for the dominant purpose of avoiding or preventing a lawful arrest. With respect to Madeline Weisser only, the trial court also found that the murder was especially heinous, atrocious, or cruel, and that the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person.
In statutory mitigation, the trial court found (1) the defendant's age and (2) lack of significant history of prior criminal activity. However, the court gave both of these factors very little weight.[1] In nonstatutory mitigation, the trial court found (1) the defendant's family background, (2) his mental problems, (3) the physical and mental abuse inflicted upon him by a parent, and (4) his voluntary confession and cooperation. However, none of these factors was given much weight.[2] Finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court sentenced Morton to death for the murders of both victims.
Morton contends that the trial court erred in permitting the prosecutor to repeatedly introduce out-of-court statements made by the State's own witnesses for the ostensible purpose of impeaching them with prior inconsistent statements. At Morton's trial, the State called as witnesses Morton's friends, his sister Angela, and Victoria Fitch. The prosecutor obviously was hoping to elicit through the witnesses' testimony the same information that they had given in their earlier statements. While these witnesses substantially incriminated Morton, their responses were more vague in detail than the answers in their original statements. At other times the witnesses responded to some of the prosecutor's questions with answers such as "Maybe," "I don't know," or "I don't recall." Whenever the prosecutor believed that a given witness's response did not sufficiently track the prior statement that the *262 witness had made, the prosecutor would read the applicable portion of the prior statement and ask the witness if it refreshed his or her memory. Sometimes, the witnesses would admit that their recollection was refreshed and that the original statements were accurate. On other occasions, they would continue to profess a lack of recollection. When the latter occurred, the judge would instruct the jury that the evidence tending to impeach the witness was not being introduced to prove the truth of the matter asserted, but only as evidence of the witness's lack of credibility. The defense's objections to the continuing manner of impeachment were overruled. During closing arguments in both the guilt and penalty phases, the prosecutor argued over defense objection that the content of the impeaching statements should be accepted as fact.
Historically, in Florida a party could not impeach its own witness except where the witness proved to be adverse. A witness was considered adverse only where the party expected the witness to give favorable evidence and the witness surprised the party by giving evidence that was prejudicial to the party producing the witness. Adams v. State, 34 Fla. 185, 15 So. 905 (1894). By the adoption of section 90.608, Florida Statutes (Supp. 1976), as part of the new evidence code, the requirement of surprise was eliminated, but it continued to be necessary for the party attempting to impeach its own witness to show that the witness's testimony was affirmatively harmful. Jackson v. State, 451 So.2d 458 (Fla.1984); see 1976 Law Revision Council Note, § 90.608, Fla.Stat.Ann. (1979). In 1990, section 90.608 was amended to remove the necessity of showing that one's own witness had become adverse. Ch. 90-174, § 1, at 743, Laws of Fla. The statute now reads in pertinent part:
Who may impeach.Any party, including the party calling the witness, may attack the credibility of a witness by:
(1) Introducing statements of the witness which are inconsistent with his present testimony.
§ 90.608, Fla.Stat. (1993). By its plain language, the statute now permits a party to impeach its own witness by introducing prior inconsistent statements without regard to whether the witness's testimony is prejudicial.
While section 90.608 no longer requires that a party's witness be adverse, the statute maintains the requirement that a prior statement be inconsistent with the witness's in-court testimony before the statement will be admitted for impeachment. Professor Ehrhardt explains:
A prior statement of a witness is admissible to impeach credibility only if it is in fact inconsistent. The prior statement should be admitted if the prior statement directly contradicts the testimony, or there is a material difference between the two.
... "Nit-picking" is not permitted under the guise of prior inconsistent statements. Whether the necessary inconsistency is present is a preliminary factual question for the court's discretion.
Charles W. Ehrhardt, Florida Evidence § 608.4, at 391-93 (1996 ed.) (footnote omitted); see, e.g., Alexander v. Bird Road Ranch & Stables, Inc., 599 So.2d 229, 230 (Fla. 3d DCA 1992).
A more difficult problem arises where, as often occurred in the instant case, a witness fails to bring out certain facts that the party calling the witness had hoped. When asked about giving a prior statement containing these facts, the witness does not deny having made the prior statement but asserts an absence of recollection of the facts in question. If the statement containing those facts is read to the jury, the jury will learn of the facts through hearsay evidence which could not have been otherwise admitted. Even if the jury is instructed that the facts should only be considered for purposes of impeachment, it may be impossible for the jury to disregard these facts as substantive evidence. Thus, the impeachment which appears to be permitted under the literal wording of section 90.608 can be subject to abuse.
There are no cases in Florida which directly address this problem in the wake of the 1990 amendment to section 90.608. However, the federal courts have been addressing this matter for some time because Federal Rule of Evidence 607 provides, without restriction, *263 that the credibility of a witness may be attacked by any party, including the party calling the witness.[3] As the Federal Rules of Evidence Manual states:
By its terms, Rule 607 would appear to permit some abusive practices, such as the following hypothetical: A prosecutor calls a witness who has made a previous statement implicating the defendant in a crime; that statement would be excluded as hearsay if offered for its truth; the prosecutor knows that the witness has repudiated the statement and if called, will testify in favor of the defendant; nonetheless, the prosecutor calls the witness for the ostensible purpose of "impeaching" him with the prior inconsistent statement. The reason that this practice appears abusive is that there is no legitimate forensic purpose in calling a witness solely to impeach him. If impeachment were the real purpose, the witness would never be called, since the most that could be accomplished is a net result of zero. As one Court put it: "The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer."
2 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 800 (6th ed. 1994).
In addressing the potential for abuse, the federal courts have consistently limited the government in criminal cases from using a prior inconsistent statement under the guise of impeachment where the primary purpose is to place before the jury substantive evidence which is otherwise inadmissible. E.g., United States v. Peterman, 841 F.2d 1474, 1479 n. 3 (10th Cir.1988) (citing cases); United States v. Hogan, 763 F.2d 697 (5th Cir. 1985); United States v. Webster, 734 F.2d 1191 (7th Cir.1984); United States v. DeLillo, 620 F.2d 939 (2d Cir.1980); United States v. Rogers, 549 F.2d 490 (8th Cir.1976); United States v. Morlang, 531 F.2d 183 (4th Cir.1975).
Where the motive of the person calling the witness is not so clear, the solution also becomes murky. Several federal courts have found good faith and permitted impeachment where the government anticipated that its witness would give evidence both helpful and harmful but thought that the harmful aspect could be nullified by introducing the witness's prior inconsistent statement. United States v. Eisen, 974 F.2d 246 (2d Cir.1992); Webster, 734 F.2d 1191. These cases and others have employed a balancing analysis under federal rule 403, which precludes the admission of evidence where the probative value is outweighed by its prejudicial impact.[4]DeLillo, 620 F.2d 939; cf. United States v. Williams, 711 F.2d 748 (6th Cir. 1983). Professor Weissenberger summarizes the approach of the federal courts as follows:
When the court is asked to disallow a party's impeachment of a witness under Rule 403, the court will consider the reliability and relevancy of the offered evidence and to some degree the motivation of the party in impeaching his witness. The reliability of the offered testimony will depend upon whether the witness has admitted making the prior inconsistent statement as well as the likelihood that the opponent of the witness will be able effectively to cross-examine the witness.
The relevancy of the impeachment evidence should be assessed in two ways: (1) the extent to which the evidence is probative of the witness's credibility, and (2) the probity of the evidence if used prejudicially as substantive evidence. The court should also consider the effectiveness of a limiting instruction in avoiding improper use of the impeachment evidence. If the relevancy of the credibility evidence is low, and its potential prejudicial impact high, the court is *264 justified in disallowing the impeachment of the witness.
Whether the party wishing to impeach his or her witness was surprised or damaged by the direct testimony may be considered in a Rule 403 balancing analysis. Surprise is an indication that the impeachment request is not merely a device to allow the jury to consider a hearsay statement that is not substantively admissible under Rule 801. A finding by the court that the proponent of the impeachment has an improper motive may result in a denial of the impeachment.
Glen Weissenberger, Federal Evidence § 607.3, at 256-57 (2d ed. 1995) (footnotes omitted).
Obviously, no single rule can be delineated to cover all of the circumstances under which parties will seek to impeach their own witnesses. Generally, however, if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating. In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.
How should these principles be applied to the instant case? Sometimes the witness's testimony was not truly inconsistent, or the discrepancies were over relatively minor details. Yet, it cannot be said that the State called these witnesses primarily for the purpose of introducing inadmissible hearsay evidence. Each of them gave testimony in varying amounts that was favorable to the State's case. When their testimony was clearly inconsistent with their prior statements, they were properly impeached. In the final analysis, the problem in this case is not so much the individual instances of impeachment as it is the effect of so much impeachment of so many witnesses.[5] The cumulative effect of continual impeachment made it all the more difficult for the jury to separate substantive evidence from the evidence it had been instructed to consider solely for impeachment. The prosecutor compounded the problem in closing argument in both the guilt and penalty phases by asserting the content of the impeaching statements as proven facts.
Despite these circumstances, we do not find it necessary to reverse the judgment of guilt. It is undisputed that Morton and his companion committed burglary by breaking into the victims' house, and Morton admitted killing Bowers and attempting to shoot and to stab Weisser. This confession together with other substantive evidence proved a strong case of felony murder without the benefit of the impeaching statements. See Brumbley v. State, 453 So.2d 381 (Fla.1984). We are convinced that any error which occurred in the guilt phase was harmless beyond a reasonable doubt.
We cannot reach the same conclusion with respect to the penalty phase. This case bears some analogy to Dudley v. State, 545 So.2d 857 (Fla.1989), a decision which predated *265 the 1990 amendment to section 90.608. In Dudley, the trial court allowed the State to impeach a court witness with evidence of prior inconsistent statements and instructed the jury that the statements could only be considered as they affected the witness's credibility and not as substantive evidence of guilt. However, the prosecutor argued the prior inconsistent statement as substantive evidence during closing arguments. We concluded that the State sought to call the witness solely for the purpose of presenting the prior inconsistent statements to prove their truth. Id. at 858-60. The prosecutor's improper use of the impeachment testimony vitiated any potential curative effect that the trial court's limiting instructions may have had. We held that in light of the defendant's own confession, the admission of the prior statements and their use as substantive evidence was harmless error as to the conviction phase. Id. at 860. However, as to the sentencing phase, we were unable to conclude beyond a reasonable doubt that the error did not contribute to the result because the inadmissible evidence was the major evidence which established the aggravator that the murder was cold, calculated, and premeditated.
As in Dudley, much of the evidence in the instant case supporting the CCP aggravator was introduced through impeachment, yet the prosecutor asked the jury to accept the content of the impeaching statements as true. In view of the inherent confusion engendered by the repeated impeachment and the prosecutor's closing argument, we cannot confidently say that the jury's recommendation of death was reliable.
One further point raised by Morton may be relevant to the retrial of the penalty phase. Morton contends that if the CCP aggravator was indeed established, then the trial court erred in finding and instructing the jury on the "avoiding lawful arrest" aggravator. The premise of Morton's argument is that the CCP aggravator in this case must have been based on a finding that the break-in was committed for the purpose of killing these particular people. He argues that if the motive for the break-in was to kill the occupants, then the dominant motive for the murders was not to avoid arrest for the break-in.
While the improper doubling of these aggravators sometimes occurs, there is no per se prohibition against a finding that both aggravators are established. In Stein v. State, 632 So.2d 1361, 1366 (Fla.1994), we upheld the trial court's finding of both the CCP aggravator and the avoiding lawful arrest aggravator because each was supported by distinct facts. We noted that the CCP aggravator focused on the manner in which the crime was executed, i.e., the advance procurement of the murder weapon, lack of resistance or provocation, the appearance of a killing carried out as a matter of course, while the avoid lawful arrest factor focused on the motivation for the crime. The record clearly reflected that the defendant and his cohort had planned to eliminate any witnesses to avoid arrest in connection with the robbery of a fast food restaurant.
In short, no improper doubling exists so long as independent facts support each aggravator. However, because the errors in this case require us to remand for a new penalty proceeding in which the evidence may vary, we are unable to make a determination at this time as to whether the record supports a finding that either or both aggravators exist.
The judgment of conviction of murder in the first degree is affirmed. The sentence of death is vacated and the case is remanded to the trial court to conduct a new penalty phase proceeding before a new jury within 120 days.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] The defendant was 19 at the time of the murders. Evidence established that his I.Q. was normal and his emotional age was consistent with his actual age. The presentence investigation report revealed that Morton had some past criminal activity, though somewhat remote and of a nonviolent nature.
[2] The trial court noted that the abuse ended when Morton was eight years old, when his mother left his father and later remarried, providing a stable father figure for Morton. Moreover, his younger sister, who had endured sexual abuse from their father, had never been arrested and had led a normal productive life. As to Morton's cooperation, this occurred only after an extensive search for him.
[3] As the federal rules were originally proposed by the Supreme Court's Advisory Committee, all prior inconsistent statements of a witness would have been admissible as substantive evidence under federal rule 801(d)(1)(A). However, Congress amended rule 801(d)(1)(A) to provide that only prior inconsistent statements given under oath at a hearing, deposition, or formal proceeding could be considered for the truth of their contents. Though not identical, section 90.801(2), Florida Statutes (1993), is substantially similar to rule 801(d)(1)(A).
[4] Florida's comparable rule is section 90.403, which states that "relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."
[5] We reject the State's alternative position that the prior statements were properly admitted to refresh the witnesses' memories. Section 90.613 does not contemplate that evidence which might otherwise be inadmissible will be paraded in front of the jury in the course of refreshing the witness's memory. Rather, the witness should be shown the statement and asked if it refreshed the witness's recollection. See Auletta v. Fried, 388 So.2d 1067 (Fla. 4th DCA 1980); Hill v. State, 355 So.2d 116 (Fla. 4th DCA 1978); Oliver v. State, 239 So.2d 637 (Fla. 1st DCA 1970), quashed on other grounds, 250 So.2d 888 (Fla. 1971).

We also reject the argument that the statements were properly admitted under the past recollection recorded exception to the hearsay rule, section 90.803(5). The State made no effort to lay the proper predicate for this exception.