761 So.2d 1165 (2000)
Donald BATESON, Appellant,
v.
STATE of Florida, Appellee.
No. 4D98-2243.
District Court of Appeal of Florida, Fourth District.
June 7, 2000.
Rehearing Denied July 20, 2000.
*1166 Douglas Duncan of Roth & Duncan, P.A., and Michael Salnick of Law Offices of Michael Salnick, P.A. (withdrawn after filing initial brief), West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Carol Cobourn Asbury and Steven R. Parrish, Assistant Attorneys General, West Palm Beach, for appellee.
STONE, J.
Bateson was convicted and sentenced on charges of burglary while armed with a firearm and grand theft. We affirm on all issues raised on appeal, but write to explain why Bateson has failed to demonstrate abuse of discretion in the trial court's denial of his motion to sever, or his motion to exclude a state's witness on grounds that the sole purpose of her testimony was to introduce impeachment evidence as substantive proof of guilt.
Bateson, a former Boynton Beach police officer, was charged with the April 4 burglary of a structure, Video Bin, while armed with a firearm, the March 15 burglary of a dwelling belonging to Harry Ellis while armed with a firearm, and the March 15 grand theft of Ellis' pistol. Bateson moved pre-trial to sever the Video Bin burglary from the Ellis burglary and grand theft.
The evidence connecting Bateson to the crimes was largely circumstantial, the numerous facts of which we recite only to the extent necessary to resolve the issues of joinder of offenses and the admissibility of Vicky Cash's testimony.
Two of the most significant pieces of evidence connecting Bateson to both crimes was the presence of Ellis' stolen Smith and Wesson handgun in a black backpack identified as belonging to Bateson and found at the scene of Bateson's escape from the Video Bin burglary, and proof that gunshots fired in the Video Bin were fired by the same Smith and Wesson.
*1167 The Video Bin burglary took place in the early morning hours of April 4; Officer Bayerl responded to a call regarding shots being fired at a shopping center. He heard a burglar alarm as he pulled in, but the alarm stopped moments later. Bayerl checked the back doors of the stores; when he got to the Video Bin, he reached for the doorknob and felt it turn from the inside. He then radioed that he believed someone was in the Video Bin. At least eight officers responded to the scene.
Some ten minutes later, after the police officers had positioned themselves to capture the suspect once he emerged, the door to the Video Bin opened. Bayerl and another officer, Lanier, were able to see someone dressed in black wearing a mask and bent over at the waist. The suspect was observed to be carrying a backpack with a protruding antenna and was wearing a shoulder holster. The suspect walked slowly, and when he got to the point where the officers at the perimeter were pointing their firearms at each other (in a cross-fire), he bolted, ran to the adjacent canal, jumped in, and swam to the other side, eluding capture. Lanier saw him remove his mask once on the other side of the canal.
Lanier went to the fence line along the canal to search for the suspect. He found a black Honda backed into the bushes in a parking lot. He called in the tag number and learned that the Honda belonged to Vicky Cash, Bateson's live-in girlfriend. At that point, Bateson identified himself on the air by stating that he was in the area and that the car was his. Bateson was not on duty at the time, he had not been seen, and his voice had not been heard over the police radio prior to the identification of the car.
Fifteen minutes later, Lanier saw someone, whom he recognized as Bateson, jump the fence. Lanier walked along the fence line and, at the location where he had seen Bateson, found a black backpack, a pair of gloves (of the same type issued by the Boynton Beach Police Department), and a black mask; nearby, he found wet clothing to which a pager was attached, lying on the bank of the canal.
The pager was traced to a fellow officer who had previously given it to Bateson, a fact confirmed by Vicky Cash. Although Bateson testified at trial that he had lost the pager the day before, Cash was unaware of that and had, in fact, paged Bateson during the morning of the Video Bin burglary.
Sergeant Briganti, the road patrol sergeant on duty at the time of the Video Bin burglary, testified that he found Bateson at his car (the Honda). Bateson appeared nervous, grungy, dirty, and wet. When Briganti first approached him, Bateson said, "I know this looks bad, but I was just out and I had my radio on and I heard the call and I thought I would help out." Briganti asked Bateson if he had a gun; Bateson initially responded that he did not, but later said that he might have a gun in his car. A gun and Bateson's identification were recovered from the car in a black fanny pack identified by Cash as belonging to Bateson. During his testimony, Bateson explained his earlier denial of possession of his firearm, stating that he assumed he had left the fanny pack home because when he got out of the Honda, he reached for it but was unable to find it.
Sergeant Gainsborg testified that Bateson told him that he was on the way to the gym, heard what was being discussed on the radio, and decided to stop by and help out. Gainsborg asked him why he did not tell anybody he was there, and Bateson replied that he did not want to break into the radio traffic.
Vicky Cash, Bateson's former girlfriend, was called as a state witness. Bateson moved to exclude Cash's testimony, arguing that the state's sole purpose in calling her as a witness was to impeach her by use of prior inconsistent statements.
Cash testified that on the morning of April 4, the date of the Video Bin burglary, Bateson left the house in the early morning *1168 hours before dawn. At the time, Cash was pregnant with Bateson's child. When asked if Bateson told her that he was going to work overtime, Cash initially stated that she did not remember what Bateson told her when he left that morning, but using Cash's sworn statement, given immediately after the crime, the state was able to refresh her recollection regarding that question. Cash then corrected her earlier response and stated that Bateson told her he was leaving to work overtime that morning.
The state also asked Cash what Bateson was wearing when he left the house that morning. Cash first responded that she did not know, but after the state refreshed her recollection using the prior sworn statement, Cash stated that she knew what he was wearing the night before"gray shorts and gray shirt that was pretty much his attire all the time." The state then asked if the shirt had the name of the University of Miami on it. Cash responded that she did not know. The state attempted to refresh Cash's recollection with her statement; however, even after reading her statement, she persisted that she did not know. Cash was then asked to read aloud her statement where she said, "A T-shirt, a short sleeve T-shirt, I don't remember what it had on it ... Miami or something, whatever ... Miami or something, I don't know."
Cash testified that Bateson told her he had taken Officer Matson's pager when he lost his and that he had Matson's pager for two years. Cash stated that she paged Bateson that morning and received no response.
The state showed Cash exhibit 9, the black backpack found at the scene, and asked if Cash had been shown the backpack previously and had identified it as Bateson's. Cash denied having identified the backpack and testified that it was not Bateson's. She admitted that she had cried when the backpack was shown to her at the Boynton Beach police station, but claimed that she had been crying during the entire interview. Cash further testified that Bateson carried his black fanny pack, in which he carried his gun and ID, everywhere.
Two investigators for the state attorney's office testified that they were present during Vicky Cash's interview when Cash was shown exhibit 9, the black backpack. They testified that when Cash was shown the backpack and identified it as belonging to Bateson,[1] she became extremely emotional and began crying hysterically. One added that Cash was not crying before she was shown the backpack.
Three weeks prior to the Video Bin burglary, Harry Ellis' home had been burglarized, and the first police officer on the scene was Bateson, who responded to the call despite assignment to a different zone. Bateson remained alone at the scene for at least twelve minutes until an additional police officer arrived. The only item missing from Ellis' house was his Smith and Wesson revolver. When Ellis attempted to supply Bateson with the serial number for the missing weapon, Bateson refused the information. Ellis was eventually successful in communicating the serial number of his stolen handgun to the detective who was assigned the investigation of the burglary.
Several weeks later, the same Smith and Wesson handgun was used in the Video Bin burglary, as proven by shell casings discharged in the premises which conclusively matched the Ellis weapon. Furthermore, the handgun appeared in a backpack found at the scene of Bateson's escape in close proximity to Bateson's pager. Although she later denied this at trial, Bateson's girlfriend, Vicky Cash, identified the backpack as belonging to Bateson in the presence of two state witnesses who confirmed the identification at trial.
*1169 Florida Rule of Criminal Procedure 3.150(a) provides:
(a) Joinder of Offenses. Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on 2 or more connected acts or transactions.
Denial of a motion for severance is reviewed for abuse of discretion. See Crossley v. State, 596 So.2d 447 (Fla.1992); Wonyetye v. State, 648 So.2d 797 (Fla. 4th DCA 1994).
In Garcia v. State, 568 So.2d 896 (Fla.1990), the supreme court explained that "the `connected acts or transactions' requirement of rule 3.150 means that the acts joined for trial must be considered `in an episodic sense.'" Id. at 899. Joinder is not warranted where the events are separate episodes connected only by similar circumstances. See Paul v. State, 385 So.2d 1371 (Fla.1980). There must be a "meaningful relationship" between the charges before permitting them to be tried together. See Ellis v. State, 622 So.2d 991 (Fla.1993).
In Ellis, the court explained that for joinder to be appropriate, the crimes must be linked in a significant way. See id. at 1000. Joinder is appropriate where there is "a causal link" between two crimes and evidence of one is necessary to explain the other, even though there may be a significant lapse in time. See id. (citing Fotopoulos v. State, 608 So.2d 784 (Fla. 1992)).
In Livingston v. State, 565 So.2d 1288 (Fla.1988), the defendant was charged with a burglary, wherein he stole a .38 caliber pistol and some jewelry, and was also charged with an armed robbery and a shooting which took place at a different location eight hours later. In the robbery, the defendant used the pistol which was stolen in the burglary. In considering the propriety of denying Livingston's motion for severance, the supreme court recognized that the crimes were "connected in an episodic sense because ... the pistol stolen in the burglary became the instrument for effecting the armed robbery and murder." Id. at 1290. Similarly, in this case, the theft of the Ellis gun circumstantially tied Bateson to the burglary of the Video Bin and vice versa. See also, Crossley, 596 So.2d at 450. Therefore, it was not an abuse of discretion to deny Bateson's motion for severance.
We also hold that the trial judge did not abuse his discretion in permitting the state to call Vicky Cash to testify in the trial. Section 90.608(1), Florida Statutes, provides
Any party, including the party calling the witness, may attack the credibility of a witness by:
(1) Introducing statements of the witness which are inconsistent with the witness's present testimony.
In Morton v. State, 689 So.2d 259 (Fla. 1997), receded from on other grounds, Rodriguez v. State, 753 So.2d 29 (Fla. 2000), our supreme court addressed the admissibility of prior inconsistent statements used to impeach one's own witness. The court noted the risk of abuse where a prosecutor calls a witness who has previously given a statement implicating the defendant but who now has repudiated that statement. See Morton, 689 So.2d at 263. The court recognized that where a prosecutor knows that the witness' testimony at trial will be favorable to the defendant but, nonetheless, calls the witness for the purpose of impeaching him with his prior statement, the practice may be considered abusive because "there is no legitimate forensic purpose in calling a witness solely to impeach him." Id. (quoting 2 Stephen A. Salzburg, et al.; Federal Rules of Evidence Manual 800 (6th ed.1994)).
The court, in Morton, observed that there can be no single rule governing all of the circumstances in which a party may *1170 seek to impeach his or her own witness, but concluded, "[g]enerally ... if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded." Id. at 264.
In this case, it cannot be conclusively stated that Cash was called for the primary purpose of impeaching her by introducing her prior inconsistent statement. In most instances, Cash's recollection during her testimony was not impeached, but was refreshed with a prior statement, which was not introduced into evidence. Her refreshed testimony was, therefore, on the record as substantive proof, not as impeachment. In only two instances did the state introduce a prior statement to impeach Cash. Given Cash's correction of her other testimony, however, the state could not have been certain that she would not eventually testify favorably as to all inquiries. Therefore, it could hardly be said that the state knew Cash would repudiate her previous statements. Further, as to the backpack, Cash's previous "identification" of the backpack was substantively proven by other witnesses.
The state's purpose in calling Cash was obviously not limited to introducing evidence by impeachment. To the contrary, her direct testimony was relied on to show that Bateson left his house in the early morning hours of April 4, that he had been using Matson's pager for two years, and that Bateson always carried his fanny pack containing his gun and identification. The witness' recollection was refreshed regarding Bateson's purpose in leaving home that morning; therefore, impeachment was not necessary. She also admitted she was crying when confronted with the backpack, albeit giving another explanation for her emotional response. Further, the attempt at impeachment by use of Cash's prior inconsistent statement was limited and did not appear to be the focus of her direct testimony. We have considered Bowles v. State, 742 So.2d 821 (Fla. 4th DCA 1999), relied on by Bateson, and deem it inapposite.
As to this and all other issues raised, we also find no error or abuse of discretion and accordingly affirm.
STEVENSON and SHAHOOD, JJ., concur.
NOTES
[1] We note that Bateson has not challenged the possible hearsay nature of this evidence either at trial or on appeal; therefore, we need not address that issue.