815 So.2d 637 (2001)
Rafael VARAS, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D99-2420.
District Court of Appeal of Florida, Third District.
December 5, 2001.
Rehearing Denied February 27, 2002.
*638 Valerie Jonas, Miami Beach, for appellant.
Robert A. Butterworth, Attorney General and Roberta G. Mandel, Assistant Attorney General, for appellee.
Before COPE, GREEN, and SHEVIN, JJ.
GREEN, J.
Appellant, Rafael Varas, was convicted of trafficking in cocaine after a jury trial. On this appeal, he argues, among other things, that the trial court abused its discretion in not permitting him to cross-examine the Drug Enforcement Administration ("DEA") agent about certain testimony given at trial which the agent had omitted in prior sworn statements. The state responds that such cross-examination would have been tantamount to non-critical, negative impeachment of the DEA agent. We disagree with the state and reverse for a new trial.
The case against Varas began on November 7, 1996, when an acquaintance of Varas by the name of Rafael Alujas telephoned DEA Special Agent Luis Perez with a tip that Varas would be going to the home of Otoniel Ginard to pick up some cocaine. Agent Perez relayed this information to DEA Special Agent Brett Scott who immediately set up a surveillance operation in front of Ginard's home. Shortly thereafter, agents observed Varas drive up to the house and go inside, where he remained for seven to ten minutes. They also observed Varas leave the house carrying an opaque brown shopping bag. Varas did not attempt to conceal the bag, nor did he display any abnormal behavior. After he got back into his car and had driven one hundred yards, the DEA agents activated their police lights and stopped Varas.
Agent Scott identified himself as a DEA agent and observed the brown shopping bag in the middle of the floorboard. The bag was within arm's reach of Varas' right leg. Scott asked Varas' permission to search the car, to which Varas replied "no problem." Scott asked Varas about the contents of the bag and Varas did not respond. Scott then asked Varas' permission again to search the car and Varas again stated "no problem." Agent Scott *639 deserved that crumpled floral type papers at the top of the opaque bag completely obscured its contents from view, until he manually widened the opening. Underneath the crumpled papers, Scott found a brick comprised of 1003.3 grams of cocaine, wrapped in opaque tape. When this tape was dusted for prints by the police, they lifted a print matching Ginard, but found no evidence of a match to Varas. The police discovered additional cocaine and money on Ginard's person, but none on Varas. Both Varas and Ginard were arrested, although the case against Ginard was later no-actioned by the state.
Varas, who had no prior criminal record, defended this charge on the grounds that he was unaware of the fact that the bag contained cocaine. He testified at trial that he had agreed to pick up the bag at the request of Alujas, a mutual friend of his and Ginard, and was under the belief that the bag contained a power drill.
According to the defense theory, Alujas had set Varas up in order to procure a sentencing reduction in a pending federal criminal case. Alujas had been charged in a four-count federal indictment for cocaine-related offenses. Approximately seven months prior to Varas' arrest, Alujas entered into a cooperation agreement with the United States government. According to the terms of the agreement, if Alujas pled guilty to Count I, conspiracy to possess with intent to distribute cocaine, and provided information to the government about the "criminal wrongdoing of other persons," the government would dismiss the remaining three counts against him and recommend a downward departure from the federal sentencing guidelines.
In the month following Varas' arrest in this case, Alujas was sentenced on Count I only, for possession with intent to distribute cocaine. This offense carried a minimum mandatory sentence of ten years or a maximum of life in prison and a fine of four million dollars. Alujas was sentenced to 108 months in prison and five thousand dollars. Prior to Varas' arrest, Alujas had never provided the government with any information which led to an arrest. In fact, the only information which Alujas provided pursuant to his agreement with the government was that which led to Varas' arrest in this case.
At trial, Agent Scott testified that when Varas was twice asked whether his car could be searched by the police, Varas appeared nervous, but appeared more nervous when asked about the contents of the brown bag. According to Agent Scott, Varas' eyes gave the appearance that he was scared, his face was sweating and his eyebrows were twitching. On cross-examination, Agent Scott was asked by the defense why he had failed to mention Varas' scared eyes and sweaty, twitching demeanor in his written arrest report, pretrial deposition or during his testimony at the suppression hearing conducted on the day before trial. The state objected to this cross-examination on the grounds that it constituted "negative impeachment." The trial court sustained the objection.
At the close of the state's case in chief, the defense moved for a judgment of acquittal on the grounds that the state had failed to establish the element of Varas' knowledge of the cocaine in the bag. The trial court denied this motion based upon Agent Scott's testimony as to Varas' sweaty, twitching demeanor as well as Varas' silence when asked about the bag's contents. During closing argument, the state again alluded to Varas' nervous demeanor as circumstantial evidence of his knowledge of the contents of the bag. The jury convicted Varas as charged and the instant appeal was taken.
*640 Varas asserts that the trial court erred in prohibiting the defense from impeaching Agent Scott on his failure to mention Varas' nervous demeanor when asked about the contents of the bag in three prior sworn statements: (1) DEA arrest report; (2) pretrial deposition and (3) the motion to suppress testimony given a day prior to trial. Through such cross-examination, the defense was attempting to establish that the witness was fabricating details about Varas' demeanor for the purpose of establishing Varas' knowledge of the contents of the bag.[1] Varas argues, and we agree, that the lower court erred in its determination that this proposed cross-examination amounted to non-critical negative impeachment of the witness.
It is well-settled that a witness may be impeached by a prior inconsistent statement, including an omission in a previous out-of-court statement about which the witness testifies at trial, if it is of a material, significant fact rather than mere details and would naturally have been mentioned. See State v. Smith, 573 So.2d 306, 313 (Fla.1990). This also includes omissions in police reports provided such omissions are of material and critical facts which are in serious contention at trial. See State v. Johnson, 284 So.2d 198 (Fla. 1973) (stating that: "[a]bsent some singular importance attaching to the point in question, which goes to a material and critical fact in serious contention in the trial, a negative basis is not the kind of use of a police report which justifies breaching the normally protected police reports and investigative notes, reports and files.... The inquiry must be upon a crucial point... and the point involved in vital focus so that it becomes critical to the defense."). Negative impeachment is more likely deemed to be permissible where a witness appears to be fabricating. See Morton v. State, 689 So.2d 259, 264 (Fla.1997).
The state does not challenge this well-settled law, but asserts that the DEA agent's trial testimony as to Varas' nervous demeanor while being questioned about the contents of the bag was mere non-critical details and for this reason, we must affirm Varas' conviction based upon our decision in Jimenez v. State, 554 So.2d 15 (Fla. 3d DCA 1989). We do not agree that the DEA agent's omitted statements constituted immaterial or non-critical details and for this reason Jimenez does not control here. In order to be convicted of the offense of trafficking in cocaine, four elements must be established beyond a reasonable doubt: a) that the defendant knowingly purchased or possessed a certain substance, b) the substance was cocaine, c) the quantity was 28 grams or more, and d) the defendant knew the substance was cocaine. Fla. Stat. § 893.135(1) (1997). The state must establish its case either by direct or circumstantial evidence. Dupree v. State of Florida, 705 So.2d 90 (Fla. 4th DCA 1998). While Varas' possession of the bag containing cocaine was undisputed at the trial below, his sole defense to the charge was that he lacked knowledge of the fact that the bag contained the substance and believed that he was transporting a power drill at the request of someone he deemed to be a friend. The state utilized the DEA agent's testimony as to Varas' demeanor to establish circumstantially Varas' knowledge of the contraband. Moreover, the trial court later relied upon that testimony to deny Varas' motion for judgment of acquittal. Considering the record before us, we do not understand how the DEA agent's testimony *641 may be deemed mere non-critical details. The DEA agent's testimony about Varas' demeanor went to the very heart of the defense below and we conclude that the trial court abused its discretion when it failed to allow Varas to impeach the agent about the omission of such evidence during pretrial statements. As for Varas' remaining points on appeal, we find that they either lack merit or have been rendered moot by this decision.
We, therefore, reverse the appellant's conviction and sentence and remand for a new trial consistent with this opinion.
Reversed and remanded.
SHEVIN, J., concurs.
COPE, J. (dissenting).
Respectfully, I believe the majority opinion has misapprehended the rule against negative impeachment announced in State v. Johnson, 284 So.2d 198 (Fla. 1973). The trial court's evidentiary ruling was fully supported by the Johnson decision and was well within the trial court's discretion.
In this case the defendant's car was stopped by Drug Enforcement Agency ("DEA") Officer Brett Scott. At trial, Scott testified that upon approaching the driver's side of the automobile, he saw a shopping bag on the floorboard next to the defendant. When he asked the defendant what was in the bag, the defendant gave him no response at all (whereas at trial, the defendant testified that he thought the bag contained a drill which he had picked up for a friend). The agent testified that when he asked about the bag and asked consent to search the vehicle and the bag, the defendant appeared nervous and began sweating.
After the defendant's arrest, the agent prepared a report on DEA Form 6. In the report, the agent did not include the fact that the defendant became nervous and began sweating when the officer asked about the contents of the bag.
On cross-examination at trial, the defense attempted to impeach the officer with the fact that the officer had omitted from his report the defendant's nervousness and sweatiness upon being asked about the contents of the bag (which turned out to contain a kilo of cocaine). The trial court sustained the State's objection that this was negative impeachment which is prohibited under the Johnson decision.
The Johnson decision states the following:
Admissibility of police reports, statements and documents depends upon the point of evidence sought to be impeached and the posture of the case. Normally, a mere negative use sought to be made of a portion of an initial police investigative report for impeachment should not be allowed; e.g., `Why did you not include in your report the fact, as you testified here today, that the defendant was dressed in dark clothing? Why did you not state in your report that he was first observed near the public telephone?' and so on.
Absent some singular importance attaching to the point in question, which goes to a material and critical fact in serious contention in the trial, a negative basis is not the kind of use of a police report which justifies breaching the normally protected police reports and investigative notes, reports and files. A permissive use would open up unjustified inquiry in almost every case as to why an officer failed to do a certain thing in one instance and did it in another, amounting to just `fishing' in a sense. The inquiry must be upon a crucial point and preferably upon a positive statement in such a report, which the witness *642 at trial flatly refutes, thus placing his credibility and the point involved in vital focus so that it becomes critical to the defense. Such an instance might be where the defendant was shot and bleeding and the officer indicated in his report that he was not injured; that he was alone when he testified there were two men, etc. The distinction becomes clear when one realizes the pressures of an investigation and the fact that certain data is to be reported at one time and other data upon other forms at a later date; that time is often critical and that insignificant points serve no purpose in such a report, though developing unforeseen seeming importance later.
284 So.2d at 200 (emphasis added).
Professor Ehrhardt has said:
If the prior statement does not mention a material circumstance which would have been natural to mention in the statement, the omission in the statement should be admissible as an inconsistent statement. The omission would generally be of a significant fact rather than details. "Nit-picking" is not permitted under the guise of prior inconsistent statements.
Charles W. Ehrhardt, Florida Evidence § 608.4, at 454-55 (2001) (footnotes omitted).
In this case the trial court heard the parties at length at sidebar and ruled:
Whether or not the defendant is sweating or not sweating or appeared nervous or not to be [is] a factor that would not necessarily be included in the report. Those are observations of the officers that may or may not come out depending on the questions asked of him in deposition or the trial.
TR. 135.
This ruling is well within the trial court's discretion. The inquiry under the Johnson decision is whether the omitted fact is one which has enough significance that no reasonable officer would have omitted it from his or her police report. The examples given by the Florida Supreme Court are examples in which the defendant was shot but the police report indicated that the defendant was not injured, or that the report indicated that the defendant was alone when the testimony was that there were two men. What the Johnson court is talking about are the essential facts of the case.
The essential facts of this case are that based on a tip, agents surveilled the home of Otto Ginard. Shortly after the appointed hour, the defendant arrived, went inside, and came out with a shopping bag. Agents stopped the defendant's car after he had driven a short distance. The agents searched the car and bag pursuant to the defendant's consent. The bag contained a kilo of cocaine.
Experience shows that officers do not routinely include in an initial arrest report every detail of what happened in the encounter between the police and the defendant. Indeed, it would be humanly impossible to do so.
The trial court was quite right in saying whether or not the defendant was sweating or nervous is something that would not necessarily be included in an initial police report. In terms of Johnson, that is among the "insignificant points [which] serve no purpose in such a report, though developing unforeseen seeming importance later." 284 So.2d at 200.
I also respectfully disagree with the majority opinion's suggestion that the testimony regarding the defendant's demeanor was the only evidence which established defendant's knowledge that the bag contained cocaine. Majority opinion at ___ & n. 1. According to defendant's testimony, *643 his long-time friend Rafael Alujas (who turned out to be the informant in this case) asked defendant to go to the home of another friend, Otto Ginard, to pick up Alujas' drill and bring it back to Alujas' home. Thus, by defendant's own account, he knew that he was picking up a drill.
Agent Scott testified that when he asked the defendant what was in the bag, the defendant did not answer him. If defendant's account is to be believed, then the defendant thought that the bag contained a drill and would have said so.
By defendant's account, when he entered Ginard's home, Ginard gave him a shopping bag which had floral paper on top, covering the bag's contents. Leaving aside the fact that one does not normally transport a power drill in a shopping bag covered with floral paper, the defendant testified that even though he was supposed to be retrieving a power drill, he did not move the paper aside to see that the bag contained what he had come for.
More critically, the State also called to the stand another DEA agent, Pete Grewden, who had participated in the surveillance. The agent testified that when the defendant came out of the house, he was holding the shopping bag by the bottom, braced against his body. He was not carrying the bag by the handles.
The significance of this, emphasized by the State in closing argument, is that by holding the bag in this way, the defendant could necessarily feel the contents. The defendant had to know that he was carrying a brick-shaped object, not a power drill.[2]
For the stated reasons, we should affirm the judgment.[3]
NOTES
[1] Other than Agent Scott's testimony, there was no other evidence of Varas' knowledge of the contents of the bag and during the trial below, Varas denied that he was ever asked about the contents of the bag by the DEA agent.
[2] I recite these facts only to indicate that this is not a conviction which rests solely on testimony that the defendant was sweaty and nervous. I do not suggest that the conviction be affirmed on a theory of harmless error. There was no evidentiary error.
[3] In a never-subsequently-cited decision, the Fourth District stated that Johnson has been overruled by an amendment to the criminal discovery rules. Hudson v. State, 682 So.2d 666, 667 (Fla. 4th DCA 1996). However, the Fourth District has since followed the Johnson decision as being controlling on the issue of negative impeachment. McBean v. State, 688 So.2d 383 (Fla. 4th DCA 1997).

The reasoning of the Hudson decision is unpersuasive. Logically the question of negative impeachment treated in Johnson could not arise unless there had already been production to the parties of the police report.
No one else has suggested that the Johnson decision lacks continuing validity. The question under consideration here is how to interpret Johnson.