POLEN, J.
 

 Appellant, John Hernandez, appeals his convictions and sentences for two counts of lewd or lascivious molestation and one count of lewd or lascivious exhibition. First, he contends that the trial court erroneously permitted the State to call witness Sherill Hernandez for the sole purpose of introducing otherwise inadmissible impeachment evidence, which highly prejudiced appellant. Second, appellant claims error by the trial court in assessing points for victim contact pursuant to
 
 Blakely v. Washington,
 
 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), where the verdict form did not have a separate interrogatory for sexual contact. Although we must reverse for a new trial on the first issue, we also address appellant’s sentencing issue, should this matter arise again.
 

 Appellant was charged in Counts 1 and 2 with the lewd or lascivious touching of P.M.’s breast/genital area, or the clothing covering the breast/genital area, on one or more occasions, between October 31, 1999 and March 31, 2004. Count 3 alleged that on one or more occasions during the same time frame, appellant exposed his genitals to P.M. in a lewd or lascivious manner. P.M. was twelve years old when the alleged conduct began.
 

 Appellant’s wife, Sherill Hernandez, was P.M.’s cousin. P.M. referred to Sherill and appellant as aunt and uncle. During the time period in question, P.M. and her two younger sisters would sleep over at the Hernandez home every other weekend or so. It was during these weekends that the alleged molestation occurred.
 

 P.M. described two incidents. In the first, she was sleeping in her cousin Jonathan’s bedroom on the floor. Appellant entered the room and asked P.M. if she was awake and wanted to watch a movie with him in the living room. P.M. said okay and went into the living room with appellant. When she got cold, appellant put her on his lap. Appellant began to push her down onto his lap and began to grind his penis against her “butt” and genital area. Appellant then lowered his pants, unbuttoned P.M.’s “jumper dress” and continued to grind against her. P.M. still had her shirt and underwear on. She could see appellant’s penis. When P.M. cried, appellant stopped and put her back in the other room. Another time, appellant entered the bedroom where P.M. slept, picked her up off the bed, laid her down on the floor and then laid on top of her. Appellant then began to grind against P.M., kiss her neck and touch her breast. Initially, P.M. testified that appellant touched her “naked” breast. Later, she testified that appellant never touched her underneath her clothes, although he attempted to do so.
 

 The incidents occurred in the early morning hours when the house was dark and the rest of the family was asleep. P.M. said she screamed during the inci-dentes), but “never ... to the point where the whole house could hear [her].” The incidents all blurred together and P.M. did not know how many times appellant did this to her. P.M. did not make the allegations until she was eighteen years old, two years after the incidents had stopped. She first told her cousin, Sashana,
 
 [1]
 
 and then later, her mother, while in the car with Sashana. Upon hearing the allegations, P.M.’s mother drove straight over to the Hernandez residence. When appellant came to the door, he got down on his
 
 *876
 
 knees, said, “I’m sorry,” and asked for forgiveness. However, P.M.’s mother did not confront appellant with any specific allegations.
 

 Later that day, P.M. went to the police station where she agreed to make a recorded phone call to appellant. The tape began with a conversation between appellant and P.M., and ended with a conversation between P.M. and Sherill Hernandez. Initially, the parties agreed that only the conversation between P.M. and appellant would be admitted as evidence. That section of the tape, which follows, was published at the end of the State’s case, and without objection:
 

 Unknown male: Hello.
 

 P.M.: Hey, is Uncle John there?
 

 Unknown male: One second.
 

 P.M.: All right.
 

 Male: Hello.
 

 P.M.: Hello.
 

 Male: Yeah.
 

 P.M.: John?
 

 Male: Yes.
 

 P.M.: It’s P.M.
 

 Male: Hi, P.M.
 

 Male: Forgive me.
 

 P.M.: I can’t.
 

 Male: Huh?
 

 P.M.: I can’t. I just want to know why. Hello.
 

 Male: I’m sorry, P.M.
 

 P.M.: Uncle John, why?
 

 Male: Can you, can you just forgive me?
 

 P.M.: No, I just want to know why you were touching me? Why did you do this? Why?
 

 Male: (No audible response).
 

 P.M.: Can you please answer me? Hello. Answer me.
 

 Male: I have to go.
 

 P.M.: No, you don’t have to go.
 

 Male: I’m sorry, P.M.
 

 P.M.: Hello.
 

 Male: I’m sorry.
 

 P.M.: I deserve the right to know why.
 

 (Thereupon the tape was stopped).
 

 After appellant spoke to P.M., the phone was passed to Sherill Hernandez. Sherill and P.M. then had a conversation, in which Sherill indicated that appellant had confessed to her.
 

 The State called Sherill Hernandez over appellant’s objection that the witness was being called for the sole purpose of impeaching her with the transcript of the controlled call. The defense advised that the witness had told defense counsel she was going to deny that appellant had ever confessed to her. The prosecutor responded: “I don’t know what she’s going to come in and say. My only good faith basis is that she is on tape making statements that her husband has admitted this molestation to her specifically.” Defense counsel noted that the State had never deposed the witness.
 

 Before Sherill testified, a proffer was taken and the tape was played for her with the aid of a transcript. Sherill recognized her voice on the tape and recalled part of the phone call, but could not understand what she was saying because “it was very difficult to hear.”
 

 Later, when she testified before the jury, Sherill denied that appellant had admitted to molesting P.M. and said that neither the tape nor the transcript refreshed her memory. When asked whether she recalled telling P.M. that appellant told her he did these things because he “wasn’t psychologically well,” Sherill said: “I may have said it, I don’t remember.” She later said, “he never said that.” She-rill said she must have been referring to the person that molested her (Sherill) as a child. After the tape was played for her
 
 *877
 
 again, outside of the jury’s presence, She-rill testified that hearing her voice did not refresh her recollection about what was said in the conversation.
 

 After extensive argument and objections, the court ruled that Sherill and P.M.’s taped conversation would be admitted as past recollection recorded. Appellant objected to the tape being admitted under that exception to the hearsay rule, citing a lack of predicate or foundation.
 

 After Sheriffs testimony, the conversation in its entirety was published to the jury:
 

 Female: Hello.
 

 P.M.: Hello?
 

 Female: Hello.
 

 P.M.: Hello?
 

 Female: P.M.
 

 P.M.: Hi.
 

 Female: I’m sorry, baby.
 

 P.M.: No, no, no. From when I was little. I was twelve years old and you knew.
 

 Female: I did not know, I had no idea.
 

 P.M.: He’s your husband.
 

 Female: I did not know.
 

 P.M.: I’m your family, not him, me.
 

 Female: I know.
 

 P.M.: I’m blood, you’re married to him.
 

 Female: I know baby. I did not know,
 

 P.M. I did not know. I’m so sorry.
 

 P.M.: I will never forgive nobody, never. The stuff I’ve been through, never. Can you please tell me, Uncle John?
 

 Female: (Inaudible).
 

 P.M.: Is he on the phone?
 

 Female: No, he’s not in the room.
 

 P.M.: Can you just put him on the phone? I just want to know why. Hello.
 

 Female: P.M.
 

 P.M.: I just want to know why he touched my vagina, my breasts and he made me sit on him, can you, just please. I’m at an age, I’m grown, can somebody please—
 

 Female: I know, I asked him why he did all of that, and that’s what he said, psychologically he wasn’t well.
 

 P.M.: Well, him and his psychological problems need to tell me why he did this to me.
 

 Female: P.M. he said psychologically he wasn’t well and (inaudible) he’s sorry.
 

 P.M.: Auntie, I have to talk to him, please.
 

 Female: (Inaudible) P.M., I’m sorry, I had no — if I knew I would have done the same thing, some relative or cousin did the same thing, I understand what you’re going through.
 

 P.M.: Okay, Auntie, are you going to put him on the phone?
 

 Female: Are you tape recording this, P.M.?
 

 P.M.: No.
 

 Female: Where are you calling from?
 

 P.M.: I’m at my friend’s house.
 

 Female: (Inaudible) I know, I just (inaudible) I’m in so much pain right now. Travis, please don’t pick up the phone.
 

 P.M.: Well, I tried, all I wanted was an answer, so, I—
 

 Female: I know—
 

 P.M.: I don’t want to hear it from you, you didn’t do it, he did it, I wanted to hear it from him. Well, I got to go.
 

 Female: P.M.
 

 P.M.: I’m sorry, I got to go.
 

 Female: P.M. P.M.
 

 P.M.: Bye.
 

 (Thereupon, the tape was stopped.)
 

 Appellant argues that the trial court reversibly erred in allowing the State to call
 
 *878
 
 Sherill Hernandez as a witness for the sole purpose of impeaching her with this inadmissible hearsay evidence. The State responds that the taped statement was admissible as a past recollection recorded, and alternatively, any error was harmless. We agree with appellant and reverse.
 

 The standard of review on the admission of evidence is abuse of discretion as limited by the rules of evidence.
 
 Hudson v. State,
 
 992 So.2d 96, 107 (Fla.2008). Unless it falls within a statutory exception, hearsay evidence is inadmissible.
 
 See
 
 § 90.802, Fla. Stat. (2008).
 

 Section 90.803(5), Florida Statutes (2008), provides an exception to the hearsay rule when a witness cannot recall matters of which he or she previously had knowledge.
 
 [2]
 
 If the proper foundation is laid, a tape-recorded statement may qualify as a recorded recollection.
 
 See Montano v. State,
 
 846 So.2d 677, 680-81 (Fla. 4th DCA 2003). To be admitted into evidence, the past recollection recorded must be offered by the witness who is either devoid of a present recollection, or possessed of an imperfect present recollection and desires to use a memorandum of a past recollection.
 
 See Kimbrough v. State,
 
 846 So.2d 540, 543 (Fla. 4th DCA 2003); § 90.803(5).
 
 “The witness must be able to assert notv that the record correctly represented his knowledge and recollection at the time of making.” Kimbrough,
 
 846 So.2d at 543 (citing J. Wigmore, Evidence §§ 734, 746(2) (Chadbourne rev. 1970));
 
 see also Montano,
 
 846 So.2d at 681-82 (witness’s tape-recorded statement given to police shortly after criminal incident was improperly admitted under recorded recollection exception to hearsay rule where witness did not acknowledge its accuracy at trial).
 

 Here, Sherill Hernandez was unable, or unwilling, to attest to the accuracy of the taped conversation. As such, the State was not able to show it could introduce the document as a “past recollection recorded.” Sherill testified definitively that appellant denied abusing P.M. This directly conflicts with the conversation on the tape. Sherill also denied that appellant had offered an explanation to her for abusing P.M., i.e., that he was not mentally or psychologically well. She testified that the tape did not refresh her recollection.
 

 Section 90.608(1), Florida Statutes, states that “[a]ny party, including the party calling the witness, may attack the credibility of a witness by ... [introducing statements of the witness which are inconsistent with the witness’s present testimony.” However, the supreme court in
 
 Morton v. State,
 
 689 So.2d 259 (Fla.1997),
 
 receded from on other grounds, Rodriguez v. State,
 
 753 So.2d 29 (Fla.2000), has recognized the risk of abuse where a prosecutor calls a witness who has previously given a statement implicating the defendant but who has since repudiated that statement.
 
 Bateson v. State,
 
 761 So.2d 1165, 1169 (Fla. 4th DCA 2000). “[W]here a prosecutor
 
 knows
 
 that the witness’ testimony at trial will be favorable to the defendant but, nonetheless, calls the witness for the purpose of impeaching [her] with [her] prior statement, the practice may be
 
 *879
 
 considered abusive because ‘there is no legitimate forensic purpose in calling a witness solely to impeach him.’ ”
 
 Id.
 
 (emphasis added.) Recognizing that a single rule could not be created to encompass all of the circumstances in which a party will seek to impeach her own witness, the court stated: “Generally ... if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded.”
 
 Morton,
 
 689 So.2d at 264.
 

 In determining whether a party calls a witness for the primary purpose of impeachment, courts may consider “(1) whether the witness’s testimony surprised the calling party, (2) whether the witness’s testimony affirmatively harmed the calling party, and (3) whether the impeachment of the witness was of
 
 de minimis
 
 substantive value.”
 
 Senterfitt v. State,
 
 837 So.2d 599, 600 (Fla. 1st DCA 2003).
 

 Recently, this court adopted the Third District’s expanded explanation of the “primary purpose” analysis in
 
 State v. Richards,
 
 843 So.2d 962 (Fla. 3d DCA 2003), which noted that the witness’s other testimony must be useful to prove a significant fact in the litigation:
 

 Application of the “mere subterfuge” or “primary purpose” doctrine focuses on the content of the witness’s testimony as a whole. If the witness’s testimony is useful to establish any fact of consequence significant in the contest of the litigation, the witness may be impeached by means of a prior inconsistent statement as to any other matter testified to. In the words of one commentator, the pivotal question is whether the “party [is] calling a witness with the reasonable expectation that the witness will testify [to] something helpful to the party’s case aside from the prior inconsistent statement.”
 

 Ruff v. State,
 
 31 So.3d 833, 837 (Fla. 4th DCA 2010) (quoting
 
 Richards,
 
 843 So.2d at 965 (emphasis omitted) (quoting 1
 
 McCormick on Evidence
 
 § 38, at 142-43 (John W. Strong ed., 5th ed. 1999)).
 

 In the instant case, a review of Sherill’s entire trial testimony reflects that it was useful only for the introduction of her prior inconsistent statements. First, we find the absence of the “surprise” factor. The State had never deposed Sherill, and the record reflects that the prosecutor had not even spoken with the witness prior to trial. Moreover, defense counsel specifically advised the State and trial court that Sherill had told defense counsel she was going to deny that appellant ever admitted to the allegations or that he had offered an explanation for doing so. During the initial proffer, the witness recognized her voice on the tape and recalled part of the phone call, but could not make out what she was saying. At the very least, then, the State should have been alerted to the possibility that Sherill’s trial testimony would be favorable to appellant. The State could and should have requested a brief recess to interview or depose the witness. Sheriffs testimony did, in fact, affirmatively harm the prosecution, because it directly opposed the point the State was trying to prove; namely, that appellant had confessed to his wife. The impeachment was not of
 
 de minimis
 
 value to the State because none of the State’s other witnesses had testified that appellant admitted to the allegations. The only other evidence Sherill offered concerned the relationship between the families, appellant’s age, and that P.M. was often an overnight houseguest in the Hernandez home. This testimony was either cumulative to that of the other witnesses or undisputed. “Paraphrasing
 
 McCormick,
 
 the prosecutor did not call [Sherill Hernandez] with any reasonable expectation that she
 
 *880
 
 would testify to something helpful to his case, aside from the prior inconsistent statement.”
 
 Ruff,
 
 31 So.3d at 838.
 

 We cannot say beyond a reasonable doubt that the admission of the tape, containing Sherill’s prior inconsistent statements, did not contribute to the jury’s verdict.
 
 See State v. DiGuilio,
 
 491 So.2d 1129, 1138 (Fla.1986). This is so despite the trial court’s cautionary instruction(s).
 
 [3]
 
 “The pertinent question in a harmless error analysis is not the sufficiency or quality of the remaining, properly admitted evidence; rather, it is ‘whether there is a reasonable possibility that the error affected the verdict.’ ”
 
 Chavez v. State,
 
 25 So.3d 49, 54 (Fla. 1st DCA 2009) (citing
 
 DiGuilio,
 
 491 So.2d at 1139);
 
 see also Ventura v. State,
 
 29 So.3d 1086, 1089 (Fla.2010) (reiterating that the harmless error test is
 
 “not
 
 a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing,
 
 or even an overwhelming evidence test.”
 
 (citing
 
 DiGuilio,
 
 491 So.2d at 1139).
 

 The subject conversation revealed the only admission of guilt by appellant, gave credence to the victim’s testimony, and provided an explanation for appellant’s non-specific requests for forgiveness, first to P.M.’s mother and later, to P.M. It was highly damaging and prejudicial — particularly, where the victim did not report the alleged conduct until two years after it had stopped and the State presented no physical evidence or corroborating witness testimony.
 

 For the foregoing reasons, we reverse for a new trial.
 

 We now comment on the sentencing issue in the event it becomes an issue following remand.
 

 During sentencing, the defense objected to the points assessed for victim contact, pursuant to
 
 Blakely v. Washington,
 
 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Counsel argued that the sexual contact points should not be included in the scoresheet calculation because the verdict form did not have a separate interrogatory for sexual contact. The State successfully argued that the victim contact inheres in the verdict and no separate jury determination was required. Accordingly, the trial court assessed sexual contact points for the two counts of lewd or lascivious molestation.
 

 Appellant argues that sexual contact did not inhere in the verdict because the testimony was ambiguous as to whether appellant touched the clothing covering the breast or genital area or the flesh itself. Appellant correctly asserts that sexual contact is not defined in the applicable statutes. However, our courts have upheld sexual contact victim injury points in instances where the offender touched
 
 clothed
 
 sexual parts of the victim.
 
 See Altman v. State,
 
 852 So.2d 870 (Fla. 4th DCA 2003) (holding that appellant’s act of lying on top of the victim with his clothed genitals pressed against hers and “humping” her constituted sexual contact for which victim injury points were appropriately scored);
 
 see also Fredette v. State,
 
 786 So.2d 27, 28 n. 2 (Fla. 5th DCA 2001) (holding that sexual contact includes touching a child’s vaginal area, and opined that this would constitute sexual contact even if the touching was over the child’s clothing);
 
 Louis v. State,
 
 764 So.2d 930 (Fla. 4th DCA 2000) (holding that touching the victim’s chest through her shirt, along with touching her stomach and genital area, involved sexual contact for which victim
 
 *881
 
 injury points were properly scored);
 
 State v. Milanes,
 
 762 So.2d 572, 573 (Fla. 5th DCA 2000) (“victim injury points can be assessed when the accused is adjudicated guilty of fondling the victim”);
 
 Mackey v. State,
 
 516 So.2d 330, 330-31 (Fla. 1st DCA 1987) (affirming victim injury points for sexual contact where defendant fondled a thirteen-year-old boy by touching him above the crotch).
 

 We therefore find the sentencing issue to be without merit.
 

 Reversed and Remanded.
 

 WARNER and STEVENSON, JJ., concur.
 

 [1]
 

 . Sashana was not called to testify at trial by either party.
 

 [2]
 

 .
 

 (5) RECORDED RECOLLECTION. A memorandum or record concerning a matter about which a witness once had knowledge, but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made by the witness when the matter was fresh in the witness’s memory and to reflect that knowledge correctly. A party may read into evidence a memorandum or record when it is admitted, but no such memorandum or record is admissible as an exhibit unless offered by an adverse party.
 

 § 90.803(5), Fla. Stat. (2008).
 

 [3]
 

 . The trial court gave the jury a limiting instruction both at the time the tape was played, and later, in the final charge to the jury-