WARNER, J.
 

 Appellant, Alan Ruff, appeals his conviction for first-degree murder of Traci Cooper. He raises multiple issues, but we find one dispositive. He claims that the trial court permitted the state to call his ex-wife solely to impeach her with prior inconsistent statements which incriminated Ruff. We agree that the primary purpose of calling the ex-wife was for impeachment purposes. Because her testimony was highly prejudicial to Ruff, we reverse and remand for a new trial.
 

 The state charged Ruff with first-degree premeditated murder of his ex-girlfriend Traci Cooper. The case proceeded to trial six times. The first and fourth trials resulted in mistrials prior to submission to the jury. The second, third, and fifth trials ended in hung juries, resulting in mistrials. On the sixth trial, a jury convicted Ruff as charged. The state presented its evidence in the last trial over multiple days. The defense did not present any evidence.
 

 The trial record established that the victim and Ruff dated for approximately six years, living together for three and raising children together. Around May or June 2001, Cooper began dating John Thomas. Cooper broke up with Ruff around August 4, 2001. Ruff was “obsessed” with Cooper and was “upset” when the relationship ended. He wanted his sister, Jeanette Ruff, who was Cooper’s best friend and coworker, to speak with Cooper to see if she would change her mind and continue the relationship. Jeanette refused and told him that Cooper had made up her mind.
 

 In September 2001, Cooper obtained a restraining order against Ruff. At some point, Ruff showed up at Cooper’s house insisting that he wanted to meet Thomas. Cooper used her body in an effort to prevent Ruff from entering and instructed him to leave, but Ruff came in anyway. Thomas introduced himself to Ruff and shook his hand. The exchange was friendly, but Thomas was afraid Ruff was going to attack him.
 

 On the morning of Sunday, October 21, 2001, Cooper went to work at Lindstrom Air Conditioning, logging onto her work computer a little after 9:00 a.m. Around 11:00 a.m., William Booth, the facilities
 
 *835
 
 manager at Lindstrom Air, unlocked the door to the business. He approached Cooper’s workstation and discovered Cooper lying face down on the floor. As he knelt down next to Cooper, he heard the front door open. He immediately stood up and saw the door latch shut. He ran outside to see who had exited the building. A jogger running by saw a man leaving the building from the front door but did not see his face.
 

 About the same time a fisherman in the area of the Lindstrom office noticed a gold vehicle approaching rapidly, exceeding the speed limit of the parking lot. The vehicle ran a stop sign, and the fisherman made eye contact with the driver. Later he positively identified Ruff as the driver of the vehicle.
 

 Officers arrived at the crime scene by 11:10 a.m. and found Cooper slightly warm with no vital signs. Cooper died of a stab wound to the abdomen. She also had multiple other cuts to her face and chest, as well as defensive wounds on her hands. Blood spatters and overturned furniture evidenced a struggle. Officers also discovered bloody paper towels in the women’s bathroom, indicating that the assailant had cleaned up after the attack. No DNA conclusively matched Ruffs DNA. Although mitochondrial DNA was found on some hairs taken from Cooper’s body which matched Ruffs, it would also have matched any maternal relative of Ruffs. Ruffs sister worked with Cooper, and the defense argued in closing that her hairs could also have been in the workplace and found their way onto Cooper’s body.
 

 Officers interviewed Ruff who provided an alibi that he was home sleeping after having worked a night shift at his job. He awoke the morning of the murder when his daughter, Cordelia, needed to borrow his vehicle. However, the state was able to supply inconsistencies in this explanation, because Cordelia’s co-worker testified that Cordelia had called her workplace around 10:45 the morning of the murder, indicating that her father had not yet come home so that she could use his car to get to work. She then called in a second time stating that her father had arrived home with scratches and blood on his shirt.
 

 Cordelia denied the statements attributed to her by her co-worker. She also gave inconsistent statements to the police. First, she told them that her father had been home when she awoke to go to work. She later told detectives that her father had not been home when she awoke to go to work, and she had to “beep” him several times. At trial, Cordelia insisted that the first statement was true and that she lied in her second statement because she felt threatened by the detective and pressured by her mother to give a second statement.
 

 The state called Clara Garcia, Ruffs ex-wife and Cordelia’s mother. The defense moved in limine to strike Garcia as a witness because the primary reason for calling her was to impeach her. The trial court denied the motion, and Garcia testified. The defense continued to object at the appropriate times and places to her testimony.
 

 Garcia testified that she and Ruff were married for approximately eleven years when they separated in 1992 or 1993. Cordelia was their eldest child. Garcia knew the victim who was already “in the picture” when Garcia and Ruff separated. Ruff retained custody of their children.
 

 On the day of the murder, Garcia received a telephone call from one of her children advising her of the situation. She called the victim’s house and talked to a detective. She was concerned for her children.
 

 The prosecutor asked Garcia if she was aware that Ruff and the victim had broken
 
 *836
 
 up some time previously. Garcia responded that she did not get involved in their relationship, nor did she talk about it with Ruff. After a few more questions, the prosecutor then asked her if she had ever made a different statement about their breakup or their relationship. Garcia said “no,” and then, when asked again said, “I don’t recall.” The prosecutor provided her with a prior statement she made to a detective approximately six months after the crime in which she had said that in the time frame of September or October before the murder, Ruff made threats against Cooper and stated how he was “going to kill that bitch.” When confronted, she admitted saying that to the officer.
 

 When the prosecutor started to elicit another statement in impeachment of her statement that she was not aware of the relationship between Ruff and Cooper, the defense again objected that the statement was highly prejudicial and improper impeachment. The court overruled the objection, and the prosecutor asked Garcia whether she had told the officers in her earlier statement that Ruff had tried to poison Cooper. She admitted that she had made that statement to the detective, but claimed it was a lie. She testified that she made the earlier statement because the detective had told her he would help her get custody of her children, which he never did.
 

 Again, over objection, the prosecutor asked whether her ex-husband ever told her how this murder could have been committed without leaving a fingerprint on the front door. Garcia responded that Ruff had never told her anything like that. However, when asked whether she had made a different statement, she admitted that she probably had. The prosecutor then read her statement to the detective: “We were just talking about it and he ended up saying anybody could have murdered Traci because the way the door opens, you don’t have to use your hand, you can use your elbow or foot to, you know, push the door.” The prosecutor asked Garcia how she could have known about the door unless Ruff had not made that statement to her. Garcia maintained that she was just guessing, as Ruff had never said anything about it.
 

 Later, the court instructed the jury that Garcia’s testimony was impeachment evidence and should not be considered substantive evidence of guilt. Nevertheless, during closing argument, the prosecutor told the jury that the statement of how the murder could be committed without leaving fingerprints on the door should be considered substantive evidence of guilt in that the defendant must have told Garcia that, because otherwise Garcia would not have known about the door.
 

 Finally, the prosecutor asked Garcia questions regarding Cordelia’s second statement to officers where Cordelia told them that Ruff was not at home diming the morning of the murder. Garcia admitted that she had contacted Cordelia to ask her to give the detective a second statement, because she feared that he would arrest Cordelia if she did not give a second statement. However, Cordelia herself testified at trial and related Garcia’s involvement in getting her to give a second statement.
 

 After the lengthy trial, argument, and instruction, the jury deliberated for a day and a half. The jury found Ruff guilty of premeditated murder, and the court sentenced him to life in prison. Ruff appeals.
 

 Ruff contends that the trial court erred in permitting the state to present the testimony of his ex-wife, Clara Garcia, when the state called her as a witness for the primary purpose of impeaching her with prior inconsistent statements. The state, however, contends that Garcia’s “re
 
 *837
 
 freshed recollection” of Ruffs threats against Cooper was not impeachment. We conclude that the primary purpose for calling Garcia was to impeach her with her prior statements.
 

 Section 90.608(1), Florida Statutes, states that “[a]ny party, including the party calling the witness, may attack the credibility of a witness by ... [introducing statements of the witness which are inconsistent with the witness’s present testimony.” A trial court’s ruling permitting the state to call a witness is reviewed for abuse of discretion.
 
 See Bateson v. State,
 
 761 So.2d 1165, 1169 (Fla. 4th DCA 2000).
 

 In
 
 Morton v. State,
 
 689 So.2d 259 (Fla.1997),
 
 receded from on other grounds, Rodriguez v. State,
 
 753 So.2d 29 (Fla.2000), our supreme court recognized that consistent with federal precedent, a risk of abuse occurs where a prosecutor calls a witness who has previously given a statement implicating the defendant but who has since repudiated that statement. In such cases, the purpose of calling the witness must be examined along with the balancing analysis under federal rule 403 to weigh the prejudice over the probative value of the evidence. Specifically, the court said:
 

 Generally, however, if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating. In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.
 

 Id.
 
 at 264. In making the determination as to whether the primary purpose is to introduce the prior inconsistent statements, a court may consider several factors, including: “(1) whether the witness’s testimony surprised the calling party, (2) whether the witness’s testimony affirmatively harmed the calling party, and (3) whether the impeachment of the witness was of
 
 de minimis
 
 substantive value.”
 
 Senterfitt v. State,
 
 837 So.2d 599, 600 (Fla. 1st DCA 2003).
 

 Explaining the “primary purpose” analysis further, the Third District noted in
 
 State v. Richards,
 
 843 So.2d 962 (Fla. 3d DCA 2003), that the witness’s other testimony must be useful to prove a significant fact in the litigation:
 

 Application of the “mere subterfuge” or “primary purpose” doctrine focuses on the content of the witness’s testimony as a whole. If the witness’s testimony is useful to establish any fact of consequence significant in the contest of the litigation, the witness may be impeached by means of a prior inconsistent statement as to any other matter testified to. In the words of one commentator, the pivotal question is whether the “party [is] calling a witness with the reasonable expectation that the witness will testify [to] something helpful to the party’s case aside from the prior inconsistent statement.”
 

 Id.
 
 at 965 (emphasis omitted) (quoting 1
 
 McCormick on Evidence
 
 § 38, at 142-43 (John W. Strong ed., 5th ed. 1999)).
 

 
 *838
 
 As applied to this case, Garcia’s testimony as a whole shows that it was useful only for the prior inconsistent statements the prosecution elicited. The prosecution knew that Garcia had recanted her prior statements incriminating Ruff. Therefore, the surprise factor was not present. Secondly, Garcia’s testimony did not affirmatively harm the prosecution. Third, the impeaching testimony was the centerpiece of Garcia’s testimony. The only other evidence she offered regarded her persuasion of Cordelia to change her testimony, but Cordelia herself testified to the very same thing, and it was not substantive evidence of any facts in dispute.
 
 [1]
 
 Paraphrasing
 
 McCormick,
 
 the prosecutor did not call Garcia with any reasonable expectation that she would testify to something helpful to his case, aside from the prior inconsistent statement.
 

 In its brief, the state contends that Garcia’s admission that she had told the detective that Ruff had threatened to kill Cooper was not impeachment. Rather the prosecutor used it to refresh her recollection. We disagree. The prosecutor asked her whether she knew about the relationship between Ruff and Cooper. She responded that she did not and that they did not talk about it. The statements about threats to Cooper were offered to impeach her trial testimony that she knew nothing of the relationship. Garcia’s prior statement demonstrating that she knew Ruff had threatened Cooper was directly contrary to her testimony that she knew nothing about them relationship nor did she talk with Ruff about it. Therefore, her statement to the detective constituted a prior inconsistent statement.
 
 See Morton,
 
 689 So.2d at 262-64.
 

 We cannot say that the introduction of the prior inconsistent statements was harmless beyond a reasonable doubt. The statements elicited from Garcia were extremely prejudicial and damaging. Although inadmissible as substantive evidence, the prosecutor still used the statement as to how the murderer could have exited the building without leaving a fingerprint as substantive evidence in his closing argument. Moreover, Garcia’s statement that Ruff said he would kill Cooper and had tried to do so in the past provided reinforcement of the prosecution’s claim of premeditation, where the evidence was extremely thin on this issue.
 

 For the foregoing reasons, we reverse for a new trial.
 

 FARMER and LEVINE, JJ., concur.
 

 [1]
 

 . The prosecutor also tried to elicit from Garcia that she learned of Cooper's murder from telephone calls to Ruff's children so as to prove that Ruff must have known about Cooper's murder prior to giving a statement to police, tire relevance of which was disputed. However, Garcia testified that she learned of it from calling Cooper's home and speaking with a detective there. It appears from the transcript that the prosecutor did not follow through on this line of questioning.