# Supreme Court of Florida

_____

No. SC14-1412
_____

**BRANDON LEE BRADLEY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 30, 2017]

PER CURIAM.

Brandon Lee Bradley appeals his conviction of first-degree murder and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Bradley's convictions for first-degree murder, robbery, fleeing and eluding, and resisting arrest with violence. We vacate his sentence of death and remand for a new sentencing proceeding.

## FACTS

Brandon Lee Bradley and Andria Kerchner were seen by another Econo Lodge guest and motel employees loading Econo Lodge property, including pillows, sheets, and an air conditioning unit, into Bradley's white Ford Explorer on

the morning of March 6, 2012, between 10:30 and 10:45 a.m. Employees of the Melbourne, Florida, Econo Lodge confronted Bradley and Kerchner in the parking lot. As the codefendants attempted to drive away, Andrew Jordan, a motel maintenance man, yelled that he would call 911 if Bradley did not get out of the car and return the property. Mr. Jordan stood in front of the car to stop its movement. As he drove out of the parking lot, Bradley hit Mr. Jordan with the car. Mr. Jordan was not injured. Econo Lodge owner Mohammad Malik called police to report the events he witnessed in the parking lot as they unfolded. Mr. Malik gave police the tag number of Bradley's white Ford Explorer, the direction of the vehicle on U.S. 192 as it left the Econo Lodge parking lot, and a description of Bradley as a black male driver accompanied by a white female passenger.

Deputy Barbara Pill was driving southbound on John Rhodes Boulevard within two miles of the Econo Lodge when she learned of the motel theft via police dispatch and spotted the white Ford Explorer. Bradley passed Deputy Pill driving northbound. Deputy Pill confirmed that the license plate matched the police dispatch description, turned to chase the vehicle, and activated her lights.

The dash camera in Deputy Pill's police cruiser began recording at 11:07:18 a.m. as she followed Bradley's white Ford Explorer. The video recording was introduced at trial. The recording shows Bradley's vehicle turn onto a residential street, Elena Way, where Deputy Pill initiated a traffic stop. Deputy Pill instructed

Bradley to exit his vehicle over twenty times, but Bradley did not comply. Deputy Pill's weapon was not drawn during the traffic stop. On the video, Bradley can be heard refusing to exit the vehicle through the partially open front driver's side door.

Eventually, Bradley began to slowly move the car forward, and Deputy Pill approached his partially open door. Deputy Pill reached into the vehicle to retrieve the keys and prevent Bradley from driving away. At about 11:11 a.m., Bradley pulled out a semiautomatic firearm and pointed it at Deputy Pill. Bradley fired eight shots at Deputy Pill from a distance of about two feet through the partially open door. The gunshots were recorded not only on the dash camera, but also on the police radio system and simultaneously broadcast to other law enforcement officers. Bradley continued pulling forward as he shot Deputy Pill. Bradley made a U-turn on the street and drove away.

A resident of Elena Way witnessed the shooting, called 911, and rushed to the street to help Deputy Pill. The resident reported a black male driver and white female passenger. Deputy James Troup arrived on the scene seconds after the shooting to find Deputy Pill lying in the street. Deputy Pill's firearm was strapped in its holster. Deputy Victor Velez arrived next. He described Deputy Pill as gasping and lying on her back. The gunshot wound to her head was so severe he did not believe she would live. Dr. Sajid Qaiser's autopsy confirmed that Deputy

Pill had been shot at a distance of under two feet, producing five gunshot wounds. Dr. Qaiser testified that the wound to Deputy Pill's head was fatal and another wound on her upper left arm was lethal.

Bradley attempted to elude law enforcement by driving down side streets and through residential yards in the neighborhood. Kerchner testified that they stopped at a house with an open garage door, hoping to find gasoline inside. Bradley parked in Gerard Joseph Weber's driveway on Janewood Lane. Weber heard the police helicopter overhead, went to his garage, and found Kerchner hiding while smoking a cigarette. Mr. Weber told her to take what she needed. Inside his home, Weber called police and notified them to follow the Explorer. Law enforcement later found Kerchner's cell phone inside Mr. Weber's garage.

A police chase ensued after Bradley and Kerchner left Janewood Lane, with the police helicopter overhead, recording the chase on video. Police on the ground employed stop sticks to halt the Explorer, and Bradley drove around them. Police cruisers activated lights and sirens throughout the chase. Bradley did not stop until he ran over stop sticks deployed by Officer Chad Cooper on Turtlemound Road. The stop sticks caused the vehicle to hit a stop sign and a guard rail, rolling to land passenger side down in a ditch filled with water. Bradley and Kerchner did not exit the vehicle until police threw a brick through the rear window to shatter the

glass about twenty minutes later.  Both Bradley and Kerchner were arrested on Turtlemound Road.

Tests conducted by the Florida Department of Law Enforcement confirmed that the handgun retrieved from Bradley's vehicle matched the bullets retrieved from Deputy Pill's body, the ground at Elena Way, and the inside of Bradley's vehicle.  Bradley did not testify at trial, but his March 6, 2012, interview was played for the jury.  In the video, Bradley told police that he shot Deputy Pill because she was trying to get her gun and he feared she would kill him.  The trial judge noted that the murder was clearly recorded on the dash camera inside Deputy Pill's police cruiser.  The trial judge also found the evidence of Bradley's guilt was "overwhelming, and beyond a shadow of any doubt . . . [e]ven without [Bradley's] confession."

Bradley was indicted for the following: (1) first-degree premeditated murder with a firearm of law enforcement officer Deputy Barbara Pill; (2) robbery; (3) aggravated fleeing or attempting to elude a law enforcement officer (siren and lights activated with high speed or reckless driving); and (4) resisting arrest with violence.  Bradley's codefendant Andria Kerchner was indicted for felony murder, robbery, and burglary.  The indictment alleged that the offenses took place March 6, 2012.  The codefendants were tried separately.

Bradley's jury trial was held from February 24, 2014, through April 1, 2014. The jury convicted Bradley of all four charges. The penalty phase was conducted from April 3, 2014, through April 8, 2014, and the jury recommended death by a vote of ten to two. Bradley waived a Presentence Investigation Report on April 8, 2014. A hearing pursuant to Spencer v. State, 615 So. 2d 688 (1993), was conducted on June 5, 2014, at which the victim's father, brother, and husband made statements. The defense presented no evidence or testimony. Both the State and defense submitted sentencing memoranda on June 18, 2014.

The trial court found five aggravators proven beyond a reasonable doubt and gave all five great weight: (1) the capital felony was committed by a person under sentence of imprisonment or placed on community control or felony probation; (2) prior violent felony; (3) the capital felony was committed in the course of a robbery; (4) the capital felony was committed for the purpose of avoiding lawful arrest or escape from custody and the victim was a law enforcement officer in performance of her official duties; and (5) the capital felony was committed in a cold, calculated, and premeditated manner (CCP).

The trial court found one statutory mitigator, the age of the defendant at the time of the crime, and assigned it no weight. The trial court also found the

following nonstatutory mitigating factors[1]: (1) Bradley was severely physically abused as a child (some weight); (2) Bradley was verbally and emotionally abused as a child (some weight); (3) Bradley's mother chose his stepfather over him and failed to protect Bradley from the stepfather's abuse (some weight); (4) Bradley witnessed the abuse of his mother by his stepfather (some weight); (5) Bradley witnessed the abuse of his siblings by his stepfather (some weight); (6) Bradley had no loving father figure or male role model (some weight); (7) Bradley has a close, loving relationship with his brother (little weight); (8) Bradley is known by family and friends to be generous and supports his mother and friends financially (little weight); (9) Bradley was addicted to and abused drugs from an early age (little weight); (10) Bradley suffers from brain damage and functional deficits (no weight); (11) Bradley suffered devastating emotional and psychological impact from the death of his cousin in October 2011 (little weight); (12) Bradley's girlfriend miscarried days after the death of his cousin and he began significantly greater drug abuse (little weight); (13) Bradley became paranoid after the death of his cousin and his girlfriend's miscarriage, believed someone was out to kill him, and obtained a gun for protection (little weight); (14) several other family members and friends were murdered or died, contributing to Bradley's emotional state (little

---

1. The trial court incorrectly labeled some of these mitigators falling under section 921.141(6)(h), Florida Statutes (2011), as "statutory mitigators."

weight); (15) Bradley has been diagnosed with mental disorders and is being treated with psychotropic medication (little weight); (16) Bradley has been diagnosed with polysubstance dependence, which is currently in remission in a controlled environment, and passive/dependent personality traits (little weight); (17) Bradley has a full-scale IQ score of 70 from a 2013 WAISC IV test (no weight); (18) Bradley cooperated with law enforcement and confessed to all offenses (little weight); (19) Bradley exhibited appropriate courtroom behavior (minimal weight); and (20) the defense's June 18, 2014, sentencing memo proposed that society is protected and Bradley is punished by a life sentence, and suggested the trial court's consideration of the nonunanimous jury recommendation (the trial court ascribed no weight, but "considered each of these factors in making [its] recommendation"). The trial court found that Bradley had not established that he suffered head injury and possible traumatic brain injury prior to the day of the crime.

The trial court found the great weight of the five aggravators was not outweighed by the numerous mitigators and "that each aggravator standing alone outweighs all of the mitigating circumstances combined." Bradley's death sentence was ordered on June 27, 2014. This appeal follows.

**ANALYSIS**

Bradley raises the following eight claims in his appeal: (1) the trial court abused its discretion in limiting voir dire concerning Bradley's prior violent felony conviction and fleeing a robbery while on probation; (2) the trial court erred in allowing the impeachment of Amanda Ozburn; (3) the trial court erred in denying a mistrial based on the testimony of Bradley's probation officer; (4) Bradley is entitled to a new penalty phase under Hurst v. Florida, 136 S. Ct. 616 (2016); (5) the trial court erred in failing to provide an example of merged aggravating factors in its instruction to the jury; (6) the trial court erred in finding aggravating factors and the absence of mitigating factors; (7) the trial court erred in denying a mistrial based on the State's penalty phase closing; and (8) the trial court erred in instructing the jury that its role in sentencing is advisory. This Court also reviews every first-degree murder conviction for which a sentence of death has been imposed for sufficiency of the evidence.

For the following reasons, we affirm Bradley's convictions and remand for a new penalty phase based on Hurst. Because we find that Bradley's Hurst claim requires a new penalty phase, we do not address the other claims related to the penalty phase of Bradley's trial or the proportionality of the sentence. Before considering Bradley's Hurst claim, we address his claims related to the guilt phase of his trial.

## I. Limited Questioning during Voir Dire

Whether a trial judge should allow interrogation of jurors on specific subjects during voir dire is reviewed under an abuse of discretion standard. See Evans v. State, 808 So. 2d 92, 105 (Fla. 2001); Davis v. State, 698 So. 2d 1182, 1190 (Fla. 1997) (citing Farina v. State, 679 So. 2d 1151, 1154 (Fla. 1996)). Trial courts have broad discretion in determining what questions may be asked for that purpose. See Pietri v. State, 644 So. 2d 1347, 1351 (Fla. 1994); Johnson v. State, 608 So. 2d 4, 9 (Fla. 1992).

Bradley argues that the trial judge abused her discretion in not permitting the defense to ask individual jurors whether they could be open to mitigation knowing that the State could prove the six specific aggravating factors, including prior violent felony and that the victim was a police officer. Bradley argues that the trial judge prevented the defense from eliciting juror bias against felons and probationers. Bradley further contends that any prejudice resulting from allowing the question would not have prejudiced the State and that it was his right to waive any resulting legal claim based on prejudice against him resulting from the aggravating factors being brought before the venire. Assuming that the trial judge abused her discretion, any error in this case is harmless because Bradley was allowed to ask other questions that were probative of juror bias. See Gore v. State, 475 So. 2d 1205, 1207 (Fla. 1985) (although trial court should have allowed defendant "to propound questions to the jury as to their bias or prejudice in

recommending a life sentence . . . the voir dire of the jurors read in its entirety evidences that this error does not amount to reversible error, but rather was harmless error beyond a reasonable doubt").

General questioning prior to the individual voir dire regarding the jurors' familiarity with the criminal justice system was already probative of bias against defendants with a prior criminal history. The jurors also heard all the charges and potential aggravators as read aloud by the judge. The defense questioned jurors about their views on various aspects of mitigation like mental health and the field of psychology. The judge allowed the defense to ask whether potential jurors believed that the killing of a police officer warranted the death penalty. The trial judge also allowed the defense to ask whether jurors could still weigh mitigation in the penalty phase after Bradley had been convicted of murdering a police officer and the State had proven six nonspecific aggravators. She only stopped the defense from asking individual jurors whether they could still consider mitigation and recommend life knowing that the State could prove all six specific aggravating factors, including prior violent felony and that the victim was a police officer.

Any error in limiting defense questioning in this case was harmless beyond a reasonable doubt given the wide range of questioning the judge allowed on the very juror biases which Bradley claims the judge stopped him from uncovering. Bradley "has not shown that his jury was made up of one or more persons

unalterably in favor of the death penalty or that any of the juror[s'] views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Gore, 475 So. 2d at 1207-08; see also Fitzpatrick v. State, 437 So. 2d 1072, 1075-76 (Fla. 1983). Therefore, we deny relief on this claim.

## II. Testimony of "High Risk Specialist" Probation Officer

Bradley argues that Charles Colon's description of his employment as a "high risk specialist officer" was improper comment which warranted a mistrial because the jury could have made the inference that Bradley was a "high risk" probationer. Although the State contends that this claim was not properly preserved by a contemporaneous objection, trial counsel objected shortly after the comment and before the witness was relieved. The objection was properly preserved. See generally Jackson v. State, 451 So. 2d 458, 461 (Fla. 1984) ("An objection need not always be made at the moment an examination enters impermissible areas of inquiry."). The trial court overruled the objection and denied the motion for mistrial.

While the denial of a motion for mistrial is reviewed for abuse of discretion, we review an overruled objection based on improper comment for harmless error. See Bright v. State, 90 So. 3d 249, 259 (Fla. 2012) (citing Poole v. State, 997 So. 2d 382, 391 n.3 (Fla. 2008)). "[V]ague and unverified information regarding . . .

prior felonies clearly has the effect of unfairly prejudicing the defendant in the eyes of the jury . . . ." Geralds v. State, 601 So. 2d 1157, 1163 (Fla. 1992); see also Rodriguez v. State, 842 So. 2d 1053 (Fla. 3d DCA 2003) (aggravated assault conviction reversed where the jury heard the alleged victim successfully obtained a restraining order, which unfairly bolstered the victim's version of events); State v. Emmund, 698 So. 2d 1318, 1320 (Fla. 3d DCA 1997) (State precluded from referring to defendant's violent criminal career in jury's presence). Bradley argues Colon's job title constituted vague information on his prior felony which caused him unfair prejudice warranting a mistrial under Geralds, 601 So. 2d at 1163.

This one-time reference to the officer's job specialty was not "so prejudicial as to vitiate the entire trial." Poole, 997 So. 2d at 391 (quoting Dessaure v. State, 891 So. 2d 455, 464-65 (Fla. 2004)). The jury would still have seen the murder in the patrol car video and heard Bradley's confession. Thus, the trial court did not abuse its discretion in denying the motion for mistrial. Therefore, we deny relief on this claim.

### III. Impeachment of Amanda Ozburn

Bradley contends that the trial court erred in allowing the State to impeach its own witness, Amanda Ozburn, introducing an otherwise inadmissible statement in violation of the rules of evidence. A trial court's ruling on admissibility of evidence will not be disturbed absent an abuse of discretion. See Bearden v. State,

161 So. 3d 1257, 1263 (Fla. 2015). Where a trial court errs in interpreting the rules

of evidence, the error is subject to de novo review. Id. (quoting Pantoja v. State,

59 So. 3d 1092, 1095 (Fla. 2011)).

We held in Morton v. State, 689 So. 2d 259, 264 (Fla. 1997), receded from

on other grounds in Rodriguez v. State, 753 So. 2d 29 (Fla. 2000), that a party may

not call a witness primarily for the purpose of getting an inadmissible statement

before the jury as impeachment:

> [I]f a party knowingly calls a witness for the primary purpose of
> introducing a prior statement which otherwise would be inadmissible,
> impeachment should ordinarily be excluded. On the other hand, a
> party may always impeach its witness if the witness gives
> affirmatively harmful testimony. In a case where a witness gives both
> favorable and unfavorable testimony, the party calling the witness
> should usually be permitted to impeach the witness with a prior
> inconsistent statement. . . . In addressing these issues, trial judges
> must have broad discretion in determining whether the probative
> value of the evidence is substantially outweighed by the danger of
> unfair prejudice or confusion.

Id. To determine whether a party has called a witness for the primary purpose of

introducing impeachment, Florida courts consider the following: (1) whether the

witness's testimony affirmatively harmed the calling party, and (2) whether the

impeachment of the witness was of de minimis substantive value. See Felton v.

State, 120 So. 3d 126, 129 (Fla. 4th DCA 2013); Bleich v. State, 108 So. 3d 1132,

1133 (Fla. 5th DCA 2013). Where a witness gives relevant testimony probative of

facts in dispute in addition to the impeachment, we have found no error. See Wade

v. State, 156 So. 3d 1004, 1021-22 (Fla. 2014); Dennis v. State, 817 So. 2d 741, 761 (Fla. 2002).

This rule prevents the abuse of the rules of evidence, as illustrated by a hypothetical situation which arguably tracks the facts in this case:

> A prosecutor calls a witness who has made a previous statement implicating the defendant in a crime; that statement would be excluded as hearsay if offered for its truth; the prosecutor knows that the witness has repudiated the statement and if called, will testify in favor of the defendant; nonetheless, the prosecutor calls the witness for the ostensible purpose of "impeaching" him with the prior inconsistent statement. The reason that this practice appears abusive is that there is no legitimate forensic purpose in calling a witness solely to impeach him. If impeachment were the real purpose, the witness would never be called, since the most that could be accomplished is a net result of zero. As one Court put it: "The maximum legitimate effect of the impeaching testimony can never be more than the cancellation of the adverse answer."

Morton, 689 So. 2d at 263 (quoting 2 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 800 (6th ed. 1994)). Ms. Ozburn gave testimony that was favorable and unsurprising to the State. Thus, the State had no proper reason to call her reliability into question. We assume the introduction of Ms. Ozburn's impeachment was improper. However, any error is harmless beyond a reasonable doubt.

We held in Morton that "[t]he cumulative effect of continual impeachment made it all the more difficult for the jury to separate substantive evidence from the evidence it had been instructed to consider solely for impeachment." Id. at 264.

- 15 -

Although we found the error harmless as to the guilt phase given the overwhelming evidence against the defendant, the error was not harmless in the penalty phase. Id. We receded from Morton in Rodriguez v. State, 753 So. 2d 29, 47 (Fla. 2000), holding that a similar error was also harmless as to the penalty phase because hearsay impeachment evidence is admissible as substantive evidence in the penalty phase so long as the defendant has an opportunity to rebut the evidence under section 921.141(1), Florida Statutes.

In this case, we find that any error was harmless as to the guilt phase because there is no reasonable probability that the error contributed to the verdict. Regardless of whether it heard Ms. Ozburn's impeachment or other testimony during the guilt phase, the jury would have seen the murder in the patrol car video, heard Bradley's confession, and heard testimony from other witnesses regarding his fear of police. There is no reasonable possibility that, but for Ms. Ozburn's impeachment testimony, the outcome at trial would have been different. Any error is harmless beyond a reasonable doubt. Therefore, we deny relief on this claim as to the guilt phase. Because Bradley is receiving a new penalty phase under Hurst, we do not address whether reference to Ms. Ozburn's testimony in the penalty phase was harmless. We caution prosecutors to adhere to the strict requirements of the evidence code and thus avoid costly possible retrials.

## IV. Sufficiency of the Evidence

We review the sufficiency of the evidence in every case in which a sentence of death has been imposed, even where the issue is not raised on appeal. See Davis v. State, 148 So. 3d 1261, 1270 (Fla. 2014); Delhall v. State, 95 So. 3d 134, 149 (Fla. 2012). Bradley raised no challenge to the sufficiency of the evidence to support his convictions. Nevertheless, we have independently reviewed the evidence and find it sufficient to support Bradley's convictions.

**V. Bradley is Entitled to a New Penalty Phase under Hurst**

During the pendency of Bradley's appeal, the United States Supreme Court issued its decision in Hurst v. Florida, which is a new rule of law applicable to cases on direct appeal. See Franklin v. State, 41 Fla. L. Weekly S573 (Fla. Nov. 23, 2016) (finding that Hurst applies to cases not yet final on direct appeal). Bradley argues that Florida's death penalty scheme is unconstitutional in light of Hurst v. Florida because a jury did not find all facts necessary to sentence him to death. We agree. See Hurst v. State, 202 So. 3d 40, 57-58 (Fla. 2016), petition for cert filed, No. 16-998 (U.S. Feb. 13, 2017). In Hurst v. State, we explained that "the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death." 202 So. 3d at 57. Because the nonunanimous

- 17 -

jury in this case did not make such findings, we cannot find the error harmless beyond a reasonable doubt.  See id. at 57-59, 66-69.  However, we reject Bradley's contention that section 775.082(2), Florida Statutes (2011), requires us to remand his case for the imposition of a life sentence.  See id. at 63-66.  See also Franklin, 41 Fla. L. Weekly at S575, slip op. at 6.

## CONCLUSION

Based on the foregoing, we affirm the trial court's denial of Bradley's guilt phase claims.  We reverse and remand for a new penalty phase for a jury to make findings under Hurst.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS and QUINCE, JJ., concur.
CANADY, POLSTON, and LAWSON, JJ., concur in result as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Brevard County,
    Morgan Laur Reinman, Judge - Case No. 052012CF035337AXXXXX

James S. Purdy, Public Defender, and Nancy Ryan, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee