# Third District Court of Appeal

## State of Florida

Opinion filed October 10, 2018.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D17-423
Lower Tribunal No. 13-26313A

————————————

**Marcelyn Mathieu,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Richard L. Hersch, Judge.

Rier Jordan, P.A., and Andrew F. Rier, for appellant.

Pamela Jo Bondi, Attorney General, and Magaly Rodriguez, Assistant Attorney General, for appellee.

Before ROTHENBERG, C.J., and SALTER and LOGUE, JJ.

SALTER, J.

Marcelyn Mathieu appeals his conviction by a jury and sentence on charges of second-degree murder with a firearm and accessory after the fact. Mathieu raises three allegedly-reversible errors during the jury trial: (1) the denial of a defense request to exercise a peremptory strike of a prospective juror; (2) the denial of a motion to suppress the identification of Mathieu from a photographic lineup contended to have been unduly suggestive; and (3) the admission of prior allegedly-inconsistent statements and hearsay testimony by the State's own witness, an evidentiary ruling allowing improper corroboration of that witness's inconsistent testimony, and the denial of Mathieu's motion to strike the witness's testimony.

We affirm without detailed analysis on points (1) and (2),[1] and we affirm on point (3) based the more extensive assessment which follows.

I. Facts and Proceedings Below

A. The Shooting; Charges against Eric Garcia

_____

[1] As to the denial of a challenged peremptory strike, the trial court carefully followed the three-step procedure detailed in Melbourne v. State, 679 So. 2d 759 (Fla. 1996). Additionally, the defense did not renew its objection to the composition of the jury panel before its members were sworn; see Baccari v. State, 145 So. 3d 958, 962-63 (Fla. 4th DCA 2014). As to the contention that the photo array identified by a witness was unduly suggestive, see State v. Joseph, 79 So. 3d 49, 50-51 (Fla. 3d DCA 2011). The record does not establish that (a) "the police employed an unnecessarily suggestive procedure," and (b) the totality of the circumstances did not give rise "to a substantial likelihood of irreparable misidentification." Id.

Evani Galvez died at the wheel of his Jeep Cherokee on July 30, 2011. His passenger, Eric Garcia, had negotiated a deal to sell marijuana that day. Garcia and the buyer had texted using drug-trade code for the terms of the deal. They arranged a meeting in the parking lot of a shopping center. Unbeknownst to the buyer, however, Garcia planned to use a BB gun that looked like a real pistol to rob the buyer of the cash for the purchase.

Before being driven by the murder victim in his Jeep Cherokee to the transaction site, Garcia smoked a marijuana joint and took Xanax. At the arranged parking lot rendezvous, Galvez and Garcia saw a white Pontiac GT waiting as well. After Garcia spoke briefly to the passenger in the Pontiac and the two confirmed that the passenger was the buyer in the intended transaction, the passenger walked with Garcia over to the victim's Jeep Cherokee. Though this was controverted during the trial, the passenger/buyer was later identified as Marcelyn Mathieu, the defendant.

Mathieu allegedly occupied the back seat of the Jeep, with Garcia in the passenger seat in front of him. Garcia turned around, pointed the BB gun at Mathieu, and directed him to empty his pocket. Mathieu complied, dropping his cash and cellphone. The victim, in the driver's seat in the Jeep, let Mathieu leave the vehicle and drove away (with Garcia still occupying the passenger seat).

Mathieu returned to the passenger seat of the white Pontiac, and that car rapidly pursued the Jeep. The two cars were driving an estimated 70 miles an hour through a residential neighborhood at one point. Ultimately the Pontiac pulled around to the left side of the Jeep and the passenger—allegedly Mathieu—fired at least two shots, one of which fatally wounded the victim in the head. The victim collapsed over the steering wheel of the Jeep and the Jeep swerved, crashing through a fence and into a house. The Pontiac continued on its course and left the area.

Garcia was temporarily knocked unconscious. When he recovered, he grabbed the BB gun and his bottle of Xanax pills and left the Jeep. Because of his prior criminal record and house arrest at the time, he threw the bottle of pills over a house and threw the BB gun over a fence and into the backyard of a nearby home. While at the crash scene, he dropped the cellphone into a sewer drain and put the money taken from Mathieu in his pocket.

In his initial statement to the police, Garcia blamed the drug robbery on the victim and identified the shooter in the Jeep as "Spook." He later admitted that he made up that name because he didn't want to get in trouble. He did say that the shooter was a "stocky" black male in a white Pontiac.

Garcia was arrested and charged with second-degree felony murder and other offenses: robbery, evidence-tampering, and a probation violation. In August

4

2012, Garcia entered into a plea agreement with the State, accepting a term of five years in state prison for the charges. To that point, he had not identified Mathieu's name or photograph. His plea agreement required him to: testify to the best of his knowledge regarding the shooter; cooperate fully with law enforcement in "locating, investigating and prosecuting" anyone involved in the murder of the victim, Galvez; give a sworn statement to the State regarding his knowledge of the murder; and testify truthfully in any depositions, hearings, trials and statements regarding those matters.

B.    The Investigation; Identification of Mathieu

Several months after Garcia's plea agreement became effective, Miami Gardens Police Detective Pacheco[2] visited Garcia in prison as part of his continued investigation and effort to identify the shooter in the Galvez murder case. Detective Pacheco showed Garcia a number of photographic lineups, but Garcia didn't identify any of the photos as the murderer.

In November 2013, Detective Pacheco found a phone number in a search of Garcia's cellphone and used it to identify the person who negotiated the failed marijuana purchase—Exson Deshommes. Pacheco showed Deshommes an array of six color photographs, one of whom was Mathieu. Deshommes identified Mathieu by circling his photo in the array and writing "I selected photo number

_____

[2]   Detective Pacheco took over the investigation after the originally-assigned investigator was promoted, and after Garcia's plea agreement was effective.

5

five as the person who was the shooter." Deshommes also gave Pacheco additional details regarding the shooting that culminated in the victim's death.

The following day, Pacheco visited Garcia at the correctional facility where he was serving his sentence. Pacheco showed Garcia another array of six color photographs prepared after Pacheco's interview with Deshommes, with a photograph of Mathieu included in the array. After Pacheco gave Garcia standard warnings that the array might or might not include a suspect, Garcia identified Mathieu's photo as a photograph of the shooter.[3]

Additional investigation identified another suspect as the driver of the white Pontiac claimed to have transported Mathieu on the day, and at the moment, of the shooting. That suspect's mother owned a white Pontiac matching the description given by an eyewitness to the traffic chase. That eyewitness saw the white Pontiac speed alongside the Jeep Cherokee and the loss of control by the shooting victim. The eyewitness also heard the gunshots and then stopped to assist the wounded victim and Garcia. The suspected driver of the white Pontiac at the time of the July 30, 2011, shooting was issued traffic citations driving that car on July 1 and August 9, 2011.

C.    Trial

---

[3] This was the color photograph challenged by Mathieu as "unduly suggestive" as his second point on appeal. The array was introduced as evidence at trial and made a part of the record here.

At trial, these facts were described by the witnesses and additional forensic experts regarding the manner and causes of the victim's death. Notably, however, Garcia admitted his many prior felonies, his lies to the police prior to his plea deal in order to "save himself," and his consumption of marijuana and Xanax the day of the shooting. Garcia was seven inches off in his testimony regarding Mathieu's height (testimony, five feet, seven inches; actual height, six feet, two inches). But Garcia expressed 100% certainty regarding his identification of Mathieu's photo.

The matchmaker for the ill-fated drug transaction/robbery, Exson Deshommes, also testified as a State witness. Deshommes had picked Mathieu out of a photo array and was the first to identify him to Detective Pacheco as the shooter. Deshommes testified at a pretrial deposition that he had been diagnosed as a schizophrenic.

At trial, portions of Deshommes' testimony were inconsistent with his prior sworn statement and pretrial deposition. He testified, for example, that he had identified Mathieu's photo in order to avoid arrest, and he denied that the man in the picture had told Deshommes about the reasons the victim was shot. Deshommes also said he didn't feel the person in the photo was the person he previously identified. He testified that he couldn't remember what he had told the police before trial or statements he had made during his pretrial deposition. He threatened to sue the trial court, and he went from the witness stand to the jury box

7

to shake a juror's hand as his testimony concluded. The defense moved to strike Deshommes' testimony in its entirety, contending that the State called Deshommes just to impeach him with his own prior out-of-court testimony.

The trial court denied the defense objections and motion to strike Deshommes' testimony. The jury returned a verdict of guilt on each charge. The trial court sentenced Mathieu to 35 years in prison, followed by probation. This appeal followed.

II.    Analysis

The trial court's ruling on the admissibility of evidence is reviewed under the abuse of discretion standard. Bearden v. State, 161 So. 3d 1257, 1263 (Fla. 2015). An error in interpreting a rule of evidence, however, is subject to de novo review. Id.

Mathieu contends in this case that the trial court erred by allowing the State to call Deshommes as a witness at trial for the primary purpose of impeaching him with otherwise inadmissible hearsay, notwithstanding timely objections and a motion to strike. The Florida Supreme Court's recent discussion on this legal issue is found in Bradley v. State, 214 So. 3d 648, 655-56 (Fla. 2017):

> We held in Morton v. State, 689 So. 2d 259, 264 (Fla. 1997), receded from on other grounds in Rodriguez v. State, 753 So. 2d 29 (Fla. 2000), that a party may not call a witness primarily for the purpose of getting an inadmissible statement before the jury as impeachment:

8

[I]f a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. . . . In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.

Id. To determine whether a party has called a witness for the primary purpose of introducing impeachment, Florida courts consider the following: (1) whether the witness's testimony affirmatively harmed the calling party, and (2) whether the impeachment of the witness was of de minimis substantive value. See Felton v. State, 120 So. 3d 126, 129 (Fla. 4th DCA 2013); Bleich v. State, 108 So. 3d 1132, 1133 (Fla. 5th DCA 2013). Where a witness gives relevant testimony probative of facts in dispute in addition to the impeachment, we have found no error. See Wade v. State, 156 So. 3d 1004, 1021-22 (Fla. 2014); Dennis v. State, 817 So. 2d 741, 761 (Fla. 2002).

In 2013, about three years before trial, Deshommes provided a positive identification of Mathieu (though without confirming his name), in a photo array presented to him by Detective Pacheco. Deshommes circled Mathieu's photo and wrote, in his own handwriting, "I selected photo number five as the person who was the shooter." In a pretrial sworn statement, Deshommes confirmed that Mathieu, "the black guy," had admitted to Deshommes that he was the person who shot the victim, while the "white boy" was driving the white Pontiac.

9

A day after Deshommes identified Mathieu in the photo array, another array containing the photo was shown to Garcia and Garcia also identified Mathieu as the shooter.

During his deposition taken nearly three years after being interviewed by Pacheco and circling Mathieu's photo, but only a month before trial, Deshommes had a more tangled recollection of some of the events, but he admitted that he circled Mathieu's photo and annotated the array in his own handwriting. He also confirmed key portions of his prior recollection as to the events of the drug transaction and Mathieu's later description of Garcia's attempt to rob Mathieu followed by the shooting.

At trial, Deshommes initially provided most of the identification evidence the State sought to adduce: the circled photo of Mathieu; that this was the person sent to buy drugs from Garcia on the day of the shooting; and that he had previously identified that person as the shooter.[4] Deshommes' vacillation during his trial testimony was confusing and may have reduced his credibility, but the veteran trial judge properly considered and denied the defense request to strike the testimony altogether. The trial judge concluded that the State was surprised by the harmful answers in parts of Deshommes' trial testimony, and "there was plenty of

---

[4] Mathieu contends that Deshommes testified inconsistently as to whether Mathieu made an out-of-court admission that he was the shooter. Mathieu argued that the state improperly sought to impeach Deshommes with hearsay, based on Deshommes' recantation at trial regarding that admission.

stuff in this [deposition] transcript and in his testimony that was necessary for this case."

Ultimately the trial court ruled that the State did not call Deshommes "exclusively for—or even in large part to impeach him," and that the actual impeachment of Deshommes was of de minimis substantive value. The court properly applied the tests set forth in Bradley.

Our careful review of the record does not find support for Mathieu's argument that impeachment was the primary purpose behind the State's decision to call Deshommes as a witness at trial. The evidence provided by Deshommes confirmed the drug deal communications between Garcia and Mathieu and the identity of the driver of the white Pontiac. Garcia confirmed Mathieu's identity.

For these reasons, we reject Mathieu's contention that the trial court erred in denying the objections and motion to strike relating to Deshommes' testimony. The judgment and sentence below are affirmed.

11