# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-4242

_____

LARRY MICHAEL THORNE,

    Appellant,

v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Okaloosa County.
William F. Stone, Judge.

May 13, 2019

B.L. THOMAS, C.J.

Appellant challenges his judgment and sentence for lewd and lascivious battery and sexual battery, arguing that the court erroneously excluded critical evidence under the Rape Shield statute, failed to order a competency evaluation before sentencing, and imposed a sentence based on an erroneous scoresheet.

### *Facts*

In 2014, Appellant was charged by information with (Count One) lewd or lascivious battery (victim over 12 but under 16 years of age), and with (Count Two) sexual battery (slight force), in violation of sections 800.04(4) and 794.011(5), Florida Statutes. Before trial, the State filed a motion in limine, in which the State anticipated that Appellant would attempt to introduce evidence of the victim's prior sexual relationships "or make some reference

thereto," and argued that such evidence was inadmissible under section 794.022(2), Florida Statutes, commonly referred to as the "Rape Shield."

The court addressed the motion at a pre-trial hearing. The victim testified that she met Appellant through church when she was in fifth grade but didn't establish a relationship with him until she was a freshman in high school. She testified that Appellant helped her pay for things, including clothes and a cellphone, and helped her get a scholarship to a dance academy. The victim testified that Appellant would occasionally pay for her pedicures and give her gift cards, and she testified that Appellant stopped giving gifts to her when she stopped attending church.

The victim testified that on November 22, 2013, she was interviewed during a counseling session at the Children's Advocacy Center. Parts of a recording of this interview were played to refresh the victim's memory. In this interview, she reported that, when she was ten, her mother's boyfriend had put his fingers inside her vagina and had severely beaten her a few months earlier. During the interview, the victim also described being touched inappropriately by her great grandfather, and by someone she referred to as "the Dominican."

The victim stated in the interview that the three incidents she mentioned were the only times she had been touched inappropriately. The victim testified that she didn't mention Appellant during this interview because he asked her not to because his church "was on the line."

Appellant moved to admit evidence that the victim had reported during three prior instances of sexual battery this interview. Appellant argued that the victim was asked if she had been inappropriately touched by anyone, and the victim named three men but not Appellant. Appellant argued that the victim was being truthful in the meeting and that she had not been touched by Appellant at the time of the interview. He argued that, when considered along with evidence of a falling-out Appellant and the victim had in December 2013 or January 2014, soon after the interview, her naming of three assailants other than Appellant tended to prove the victim's motivation to fabricate the accusations. Appellant argued that after he stopped giving her

2

gifts, the victim fabricated an allegation against him, and this defense was bolstered by evidence that she did not accuse Appellant, but did name three other men, in the interview less than a month earlier.

The court ruled that Appellant would not be allowed to introduce evidence that the victim had named three men but not Appellant in the November 22, 2013 interview. The court stated that the instances were "precluded by the Rape Shield Law" and were not relevant to Appellant's defense. The court allowed Appellant to ask the victim whether she had accused him during the interview, but not about her reporting of sexual batteries by three other men.

At trial, the victim testified before the jury about the November 22, 2013 interview. The victim testified that the interviewer asked her if anyone had touched her inappropriately, and that she did not name Appellant. The victim testified that she did not name Appellant during that interview because she was "terrified to tell" and that no one would believe her.

At sidebar, Appellant argued that, with this testimony, the victim had opened the door to the evidence of the three prior reports of sexual battery. He argued that, although she said she was terrified to name Appellant, she had named three other men in the same interview. The court denied Appellant's request to question the victim about her reporting the three prior sexual batteries.

The victim testified that she met Appellant through the church where she was a member and he was pastor; she was fourteen when she first began spending time with Appellant. She testified that she would spend the night at Appellant's house and share his bed. The victim testified that on several occasions Appellant massaged her body and inserted his fingers and tongue inside her "vaginal area." The victim testified that, once, Appellant inserted his penis partially inside her.

The victim testified that she decided to "cut off all ties" with Appellant in November 2014 after he showed her a box of condoms while they were shopping. She testified that this made her uncomfortable, and after Appellant dropped her off at her family's

3

home that night, her "family could tell something had happened." She testified that she reported Appellant's actions.

At trial the State played a recording of a controlled phone call between Appellant and the victim. On the recording, the victim asked Appellant "why did you do that to me, though? That's the only thing that's bothering me right now." Appellant asked, "You mean us fooling around?" and stated "I don't know . . . but when you get two people together . . . done anything." The victim continued, "But you never answered my question. Why did you do that stuff?" Appellant responded "Yeah, it was wrong. I don't know." Appellant stated "Just know that my heart is pure. I'd never do anything to hurt you ever again. You have my word." Appellant then told the victim she "had a way of coming on to guys quickly."

Over Appellant's objections, two *Williams*[1] rule witnesses testified regarding their relationships with Appellant. The first *Williams* rule witness was thirty-nine years old at the time of the trial. She testified she met Appellant when she was thirteen or fourteen, when she started attending the church where Appellant was a youth pastor. She testified that she and Appellant began spending time alone, and that eventually they developed a physically intimate relationship, during which Appellant penetrated her vagina with his penis. She testified that she was fourteen at the time of this relationship with Appellant, which lasted several months.

The second *Williams* rule witness, who was forty-three years old at the time of trial, testified that she was fourteen or fifteen when she began "hanging out" with Appellant when he became the youth pastor at her church. She testified that she would go over to Appellant's house alone, and that he would give her massages. She testified that she was sixteen and Appellant twenty-seven when they began a physically intimate relationship, involving sexual intercourse, that lasted "about a year." On cross examination, when asked about Appellant's inability to defend himself against her testimony twenty-seven years after the incident allegedly

---

[1] *Williams v. State*, 110 So. 2d 65 (Fla. 1959).

occurred, the witness replied, "Then he shouldn't have done it" and asked counsel "Did he say he didn't do it?"

A woman who worked in children's ministry for the church where Appellant was a pastor testified that she met the victim when the victim was fifteen. She testified that she continued to have contact with Appellant after he was arrested and charged in the present case, and that she would relay messages to the victim on behalf of Appellant. The witness testified that she provided gift cards to the victim and promised her a car and money for an apartment, if she dropped the charges against Appellant. This witness conceded that she had been charged with tampering with a witness related to her contact with the victim and had pleaded to the lesser included offense of tampering with evidence.

The jury found Appellant guilty as charged in the information.

In Appellant's pre-sentencing report, a probation/parole officer wrote the following:

> [Appellant] stated he is suffering mentally now since being incarcerated. He stated he can hear his deceased father's voice at night. He kept crying while speaking to this Officer. He could not concentrate on what this Officer asked him. He feels his life is in danger due to other inmates.

Appellant's counsel filed an emergency motion to continue sentencing, stating that, while meeting with Appellant on August 21 and 22, 2017, "it became apparent to counsel that [Appellant] was unable to comprehend the issues with regard to sentencing or to assist his counsel in preparation for sentencing." Appellant's counsel stated that he had "reasonable grounds to believe that [Appellant] is not mentally competent to proceed." At a hearing, Appellant's counsel testified to reiterate the assertions in his motion to continue sentencing.

At the hearing, the State played recordings of jail calls between Appellant and his mother, which, according to the State, were made on August 18 and 22, 2017. In the recordings, Appellant and his mother discussed Appellant's mother meeting with an acquaintance, Appellant receiving a birthday card from his daughter, Appellant requesting an extension of time with the court

5

to accommodate an expert witness, Appellant's mother gathering letters from acquaintances to attest to Appellants' character, and about gathering witnesses to testify at Appellant's sentencing hearing. The State argued that the jail calls showed that Appellant was participating in the preparation of his sentencing hearing, and thus understood the proceedings and was competent. The court stated it had no "reasonable belief that [Appellant] suffers from any condition, which would subject him to a competency review," and did not continue the sentencing hearing.

On Appellant's Criminal Punishment Code scoresheet, the State assessed Appellant 80 points for "Sex Penetration" for both counts, which increased Appellant's lowest permissible sentence to 182.5 months. However, the information for Count One alleged that Appellant had violated section 800.04(4) Florida Statues by inserting his penis into the victim's vagina or mouth or by "union" of his tongue with the victim's "vaginal area." The jury instructions for both counts stated that the State only needed to prove that "the sexual organ of [Appellant] penetrated or had union with the vagina of" the victim. Appellant did not object to the State's guidelines sentence calculation based on the penetration points. The court sentenced Appellant to consecutive 180-month sentences for both counts.

Appellant filed a motion to correct sentence under Florida Rule of Criminal Procedure 3.800(b). Appellant argued that because the jury instructions stated that both counts could be proven if the jury found either "union" or "penetration," and because the verdict form did not specify whether union or penetration was found, Appellant's minimum scoresheet sentence was impermissibly increased by a factor not found by the jury.

In an order on Appellant's motion to correct sentence, the court agreed that Appellant should only have been assessed 40 victim injury points for the sexual contact in Count One, rather than 80 points for sexual penetration, and ordered a corrected scoresheet be prepared. However, the court found that any scoresheet error was harmless, as the court demonstrated, through its imposition of consecutive 180-month sentences (the maximum permissible by law), that it would have imposed the same sentence even with a correct scoresheet.

6

*Analysis*

### I. Whether the trial court erred in limiting evidence of the victim's sexual abuse history

Appellant argues that the trial court erred in excluding his proffered evidence that the victim had initially identified three other assailants and did not name him until a later interview. Appellant argues that this evidence was outside the ambit of the Rape Shield.

"As a general rule, a trial court's ruling on the admissibility of evidence will not be reversed, absent an abuse of discretion." *McCray v. State*, 919 So. 2d 647, 649 (Fla. 1st DCA 2006). "However, a trial court's discretion over such decisions is limited by the evidence code and the applicable case law, and its interpretation of those authorities is subject to *de novo* review." *Hendricks v. State*, 34 So. 3d 819, 822 (Fla. 1st DCA 2010).

"The rape shield law does not exclude evidence that would otherwise be admissible under the Florida Evidence Code; instead, section 794.022 is a codification of Florida's relevance rules as applied to the sexual behavior of victims of sexual crimes." *Teachman v. State*, 44 Fla. L.W. D159 at *3 (Fla. 1st DCA 2019).

The statute reads, in relevant part:

(2) Specific instances of prior *consensual* sexual activity between the victim and any person other than the offender may not be admitted into evidence in a prosecution under s. 787.06, s. 794.011, or s. 800.04. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of *consent*.

(3) Notwithstanding any other provision of law, reputation evidence relating to a victim's prior sexual conduct or evidence presented for the purpose of showing that manner of dress of the victim at the time of the offense incited the sexual battery may not be admitted into evidence in a prosecution under s. 787.06, s. 794.011, or s. 800.04.

§ 794.022(2-3), Fla. Stat. (2018) (emphasis added).

As the statute plainly states, the Rape Shield "only relates to *consensual* sexual activity with a person other than the accused." *Gomez v. State*, 245 So. 3d 950, 953 (Fla. 4th DCA 2018); *see also McLean v. State*, 754 So. 2d 176, 182 (Fla. 2d DCA 2000) (holding "[t]he Rape Shield Statute . . . prohibits evidence of specific instances of prior *consensual* activity between the victim and any person other than the offender in sexual battery cases) (emphasis added)).

Appellant did not proffer any evidence of the victim's consensual sexual acts, but rather proffered an interview in which the victim reported that three men had sexually battered her. Because the proffered evidence was of the victim's allegations of nonconsensual conduct by other men, the Rape Shield did not apply. *See Gomez*, 245 So. 3d at 953 ("The appellant sought to introduce the victim's prior allegation against her employer of sexual assault. As the victim did not attribute this to prior consensual conduct, it does not fit within the rape shield law"). However, the evidence was subject to the general rules of relevance.

"[R]elevant evidence is that which tends to prove or disprove a material fact." *Grau v. Branham*, 761 So. 2d 375, 378 (Fla. 4th DCA 2000) (citing § 90.401, Fla. Stat.). "All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, or unless otherwise excluded by law." *Id.* (citing §§ 90.402, 90.403, Fla. Stat.).

Appellant's theory of defense was that the victim fabricated her allegations against him after he stopped giving her gifts, and Appellant argues that the victim's accusing three men without accusing Appellant tended to support this theory. "Because liberty is at risk in a criminal case, a defendant is afforded wide latitude

8

to develop the motive behind a witness's testimony." *Williams v. State*, 912 So. 2d 66, 68 (Fla. 4th DCA 2005) (citations omitted). "The ability to expose an improper impetus for a witness's testimony is an essential component of the right to a jury trial." *Id.*

In *Lewis v. State*, 591 So. 2d 922, 925 (Fla. 1991), the supreme court recognized the general rule of relevancy regarding the prior sexual conduct of a sexual battery victim: "a victim of a sexual assault should not be subjected to having her sexual history brought up in open court," but where "application of this rule interferes with confrontation rights, or otherwise precludes a defendant from presenting a full and fair defense, the rule must give way to the defendant's constitutional rights." Here, the proffered evidence tended to prove the victim's motivation to fabricate her allegations, if the jury believed the victim did not accuse the defendant in the initial interview because the sexual activity did not occur. By excluding this evidence, the trial court prevented Appellant from "presenting a full and fair defense." *Id.* at 925. This was error.

## II. Whether the error was harmless

The State argues alternatively that any error in excluding the evidence of the victim's other accusations was harmless. As the beneficiary of the error, the State has the burden to show that the error was harmless. *State v. DiGuilio,* 491 So.2d 1129, 1139 (Fla. 1986). "If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful." *Id.*

Courts have grappled with this analysis for decades. The harmless-error test is frequently explained in the negative, defined by what it is *not*: "The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test." *Id.* at 1139. "[T]he test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." *Id.* at 1135.

9

Although *DiGulio* states that the harmless error test is not simply one of overwhelming evidence, later supreme court cases suggest that the overwhelming evidence of a defendant's guilt may be considered in the harmless-error analysis where guilt has been established by evidence not related to the claimed error. In *Cuervo v. State*, 967 So. 2d 155, 178 (Fla. 2007), the jury heard unimpeached and corroborated testimony that Cuervo had stabbed the victim, thus establishing his guilt to the charged offense of attempted first-degree murder with a weapon. The supreme court held that "[a]ny error in admitting Cuervo's confession was harmless due to the *overwhelming evidence of guilt* against Cuervo," as "[n]one of the facts revealed in Cuervo's confession established elements of the crime that were not already established by the victim's testimony." *Id.* (emphasis added). In *Chavez v. State*, 832 So. 2d 730, 753 (Fla. 2002), Chavez's guilt for the abduction, molestation, and murder of a nine-year-old victim was established by extensive evidence, including an initial, uncoerced confession, and the supreme court held that "even assuming that suppression [of a later confession] were appropriate, given the *overwhelming evidence of Chavez's guilt*, the error in admitting his last confession would be harmless." (emphasis added). In *Larkins v. State*, 655 So. 2d 95, 98 (Fla. 1995), "there was direct evidence of Larkins' guilt, including eyewitness testimony" separate from the testimony of two witnesses whom the defense was precluded from cross examining regarding pending charges against them. The supreme court held that, "[i]n light of the *overwhelming evidence of guilt* and the questionable weight of the evidence of pending charges considered in the context of the other matters elicited in the proffer, we conclude that it was harmless error to deny cross-examination of the [two witnesses] with regard to pending charges." *Id.* at 99 (emphasis added). *See also Burr v. State*, 576 So. 2d 278, 280 (Fla. 1991) (holding that while admission of collateral crimes evidence was error, "we believe this error was harmless in light of the *overwhelming evidence of guilt* discernible in our review of the entire record" where the erroneously admitted evidence was "in addition to other evidence of guilt," *Burr v. State*, 550 So. 2d 444, 446 (Fla. 1989) (emphasis added)).

Errors even can also be deemed harmless where the defendant's guilt was established by evidence unrelated to the

error, even where the court did not deem that properly admitted evidence to be "overwhelming." *Bradley v. State*, 214 So. 3d 648, 656 (Fla. 2017) (holding error related to improper impeachment of a witness was harmless where the jury also saw murder in patrol-car video and heard the defendant's confession); *Johnson v. State*, 994 So. 2d 960, 964-65 (Fla. 2008) (holding error in denying defendant a jury trial on the second phase of felony DUI proceeding was harmless where the defendant's driving record indicated he had three requisite DUI convictions, establishing guilt of felony DUI). Conversely, error can be harmful even where "properly admitted evidence was sufficient to support a jury verdict of guilty." *State v. Lee*, 531 So. 2d 133, 136 (Fla. 1988) (holding that, even though evidence was sufficient to support a guilty verdict, "we decline to modify the *DiGuilio* test to require only a showing that the permissible evidence would support the conviction in order to find the erroneous admission of improper collateral crime evidence harmless"). Viewing these two propositions together and acknowledging that the State bears the burden of proving beyond a reasonable doubt that error did not affect the verdict, it follows that an error cannot be harmless if guilt is *not* established by the evidence unrelated to the error.

Here, the trial court erred by excluding admissible evidence offered to challenge the victim's credibility during the November 22, 2013, interview. The State argues that its case "does not rest solely on the victim's credibility" and that Appellant's guilt was established by evidence unconnected to the credibility of the victim. The State points to the controlled call, the testimony from two *Williams* rule witnesses, and testimony that Appellant attempted to persuade the victim to drop the charges by enlisting his assistant to offer the victim gifts.

Appellant argues conversely that because the victim's credibility was a key issue in the case, the trial court's error in preventing him from challenging that credibility cannot be harmless beyond a reasonable doubt. Appellant asserts the error was harmful because he was "prevented from informing the jury regarding the true nature of the alleged victim's November 22, 2013, denial."

At trial, the State established Appellant's guilt through evidence unrelated to the nature of the November 2013 interview.

11

The victim testified in detail about her spending the night at Appellant's house and sharing a bed with him and testified that he inserted his fingers and penis into her vagina. The State bolstered her credibility through extensive evidence unrelated to the November 22, 2013, interview; the *Williams* rule witnesses, with their devastating answers on cross-examination, the controlled call, and testimony of evidence tampering all supported the State's theory that the victim's testimony was not fabricated.

In addition, Appellant was allowed to establish that the victim did *not* accuse him during the November interview, although we recognize that the error allowed the victim to testify she was "afraid" to report Appellant, when one of the perpetrators that she did name had beaten her. While Appellant was not allowed to elicit testimony that the victim accused others who had molested her, such collateral impeachment did not wholly deprive Appellant of the opportunity to demonstrate to the jury that the victim had not accused Appellant when she had the opportunity. And had Appellant cross examined the victim about the people who had sexually molested her, there is a reasonable possibility the answer could have engendered empathy from the jury for the victim, thereby increasing her credibility. In addition, the victim would have explained that Appellant urged her not to report him as it would cause him to lose his church. Also, the victim testified that she reported Appellant's actions after he showed her a box of condoms in November 2014, nearly a year after interview at the advocacy center. This indicates that, at the time of the interview, the victim had not yet decided that she wanted to report Appellant. Thus, we hold the error was harmless beyond a reasonable doubt in light of the extensive inculpatory evidence and the entire context of the November 2013 interview.

### III. Whether the trial court erred by not ordering a competency evaluation

A trial court's determination whether to hold a competency hearing is reviewed for an abuse of discretion. *Pickles v. State*, 976 So. 2d 690, 692 (Fla. 4th DCA 2008). A trial court only abuses its discretion if "no reasonable person would take the view adopted by the trial court." *Scott v. State*, 717 So. 2d 908, 911 (Fla. 1998).

12

"[A] trial court has a duty to conduct a competency proceeding when it has 'reasonable ground[s] to believe that the defendant is not mentally competent to proceed[.]'" *Mars v. State*, 251 So. 3d 339, 345 (Fla. 1st DCA 2018) (quoting Fla. R. Crim P. 3.210(b)). "Competency to stand trial" means the defendant can consult with counsel with a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings. *Id.*

At a hearing on Appellant's 3.210(b) motion, Appellant's counsel testified, as he had sworn in his motion, that Appellant was unable to comprehend the issues regarding sentencing or to assist his counsel in preparation for sentencing. The court considered the presentencing report, and also considered the recordings of phone calls between Appellant and his mother, made during the time in which Appellant's counsel said Appellant was unresponsive. During the calls, Appellant conversed with his mother about multiple topics, including getting witnesses to testify and write letters on his behalf for sentencing.

Considering this evidence, the court found no reasonable ground to hold a competency hearing. The evidence presented at the hearing was conflicting, and "it is the duty of the trial court to determine what weight should be given to conflicting testimony." *Mason v. State*, 597 So. 2d 776, 779 (Fla. 1992). Because a reasonable person could view the recordings of the phone calls between Appellant and his mother as evidence that Appellant had a "rational and factual understanding" of the pending proceedings, the trial court did not abuse its discretion in denying Appellant's motion for a competency proceeding.

## IV. *Whether the scoresheet error was harmless*

The State concedes that the court erroneously included "penetration points" on Appellant's scoresheet but argues that this error was harmless, because the court indicated it would have imposed the maximum 360-month sentence regardless of the lowest permissible sentence. "When scoresheet error is presented [through, *inter alia*, a rule 3.800(b) motion], any error is harmless if the record conclusively shows that the trial court would have imposed the same sentence using a correct scoresheet." *Brooks v. State*, 969 So. 2d 238, 241 (Fla. 2007) (emphasis removed). Despite Appellant's arguments to the contrary, the sentencing court's "post

13

hoc" statements in an order on a rule 3.800 motion explaining the considerations it made during sentencing can serve to conclusively show that the court would have imposed the same sentence with a correct scoresheet. *White v. State*, 873 So. 2d 600 (Fla. 5th DCA 2004) (holding that the record conclusively showed the trial court would have imposed the same sentence even if it had a correct scoresheet where the court, in an order on a 3.800 motion, stated that the scoresheet was used "only as part of the overall sentencing decision," and that the sentence "was lawful and correct").

The court stated it would have imposed the maximum sentence regardless of the lowest permissible sentence, as indicated by its sentencing Appellant to consecutive 180-month sentences. The scoresheet error was therefore harmless.

AFFIRMED.

M.K. THOMAS, J., and GAY, SHONNA YOUNG, ASSOCIATE JUDGE, concur.

––––––––––––––––––––––––––

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

––––––––––––––––––––––––––

Michael Ufferman, Tallahassee, for Appellant.

Ashley Moody, Attorney General, Kaitlin Weiss, Assistant Attorney General, Tallahassee, for Appellee.

14